**COLYER et al. v. SKEFFINGTON, Com'r of Immigration. KATZEFF et al. v. SAME (three cases). In re HARBATUK et al. In re MACK et al.**

(District Court, D. Massachusetts. June 23, 1920.)

Nos. 1833, 1835, 1837, and 1845.

1. **Aliens ⬡⟶18—Right of Congress to deport aliens is unlimited.**

There is no constitutional limit to the power of Congress to exclude or expel aliens.

2. **Aliens ⬡⟶54—Courts can interfere with immigration officer's decisions only for error of law.**

The courts have no jurisdiction on habeas corpus proceedings to interfere with proceedings in the Department of Labor for the exclusion or expulsion of aliens, unless and until there is some error of law in that department, or the proceedings are unfair, the department's decision on the facts is conclusive.

3. **Aliens ⬡⟶54—Courts must review proceedings shown to be unfair or lacking due process.**

If proceedings in the Department of Labor for the exclusion or expulsion of aliens are unfair or otherwise lacking in the essential elements of due process of law, or if the Secretary proceeded on an erroneous view of the law, the courts must review such proceedings.

4. **Habeas corpus ⬡⟶23—Writ issued to test rights of aliens under arrest for deportation.**

While proceedings for the deportation of aliens are not criminal proceedings, aliens who are thereby deprived of their liberty may have their legal right to liberty tested on habeas corpus proceedings.

5. **Aliens ⬡⟶4—Constitutional law ⬡⟶252—Searches and seizures ⬡⟶7—Aliens have right to due process and freedom from unreasonable search.**

The Fourth, Fifth, Sixth, and Fourteenth Amendments to the Constitution are not limited in their application to citizens, but apply to all persons within the United States, including aliens, so that aliens cannot be deprived of their liberty without due process of law and are exempt from unwarranted searches and seizures.

6. **Aliens ⬡⟶18—Department of Justice not authorized to administer immigration laws.**

Congress has intrusted the administration of the immigration laws to the Department of Labor, and the Department of Justice has no legal right or power to deal with the exclusion or expulsion of aliens.

7. **Evidence ⬡⟶47—Courts take judicial notice of immigration rules of Secretary of Labor.**

The rules and regulations of the Secretary of Labor, made under the authority of the immigration laws for enforcing the provisions of those laws, have the effect of law, and courts must take judicial notice of them.

8. **Aliens ⬡⟶54—Hearing before immigration officer must be fair.**

The records on which the decisions of the Secretary of Labor, in proceedings for the deportation of aliens, are based, must, under Immigration Rules 17 and 22, requiring affidavit for warrant and right to counsel and production of evidence, be fairly made by real trials before immigration inspectors, though the trials may be summary, or the alien is deprived of his real rights on appeal given him by Act Feb. 5, 1917, § 17 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 4289¼ii).

9. **Aliens ⬡⟶54—Unfair hearing in deportation proceedings is fraud on Secretary of Labor.**

An unfair or misleading record in proceedings for the deportation of an alien is as much a fraud upon the law and upon the Secretary of La-

⬡⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
265 F.—2

bor as upon the alien, since the general policy of the United States has been to admit all immigrants. except those specifically described as undesirable.

10. **Searches and seizures** ☞7—**Search warrant provision in Espionage Act impliedly excludes such warrants in alien deportation proceedings.**

The provision of Espionage Act June 15, 1917, tit. 11 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 10496¼a–10496¼v), authorizing the use of search warrants within specific limits, which is the only relevant provision for search warrants, impliedly prohibits the use of search warrants to procure evidence of membership by aliens in organizations seeking to overthrow the government by force or violence.

11. **Aliens** ☞54—**Amendment of rule so as to deny counsel at opening of hearing is a pertinent fact bearing on the question of due process.**

The amendment of Immigration Rule 22, subd. 5, par. (b), which originally entitled an alien to counsel when arrested, so as to entitle him to counsel only when the hearing has proceeded sufficiently to protect the government's interests, and which was made in contemplation of a large number of hearings of deportation proceedings, tended to make those proceedings unfair by depriving the aliens of counsel until after they had admitted membership in a proscribed organization.

12. **Aliens** ☞54—**Deportation proceedings instigated by Department of Justice agents not void.**

Though Congress has delegated to the Department of Labor the power and duty of investigating and deporting aliens of the proscribed classes, the fact that the department, in issuing warrants, acted on information secured by agents of the Department of Justice, instead of on its independent investigation, does not render the proceedings void, though the method of investigation may have been such as to cast suspicion on the fairness of the proceedings.

13. **Appeal and error** ☞8—**Federal court cannot reserve questions for decision of higher court.**

The federal court has no power to reserve or report questions to the higher court for decision, but must pass on all issues involved, so that an appeal may be taken to the higher court.

14. **Habeas corpus** ☞92(1)—**Court can review construction of statute.**

The courts, in habeas corpus proceedings, can review the construction placed upon a statute by the Secretary of Labor or the immigration officers in proceedings for the deportation of an alien.

15. **Aliens** ☞54—**Whether there is any evidence to support finding is question of law reviewable by court.**

In proceedings for the deportation of aliens, the question whether there is any evidence to support a finding necessary to the deportation of the alien is a question of law, which can be reviewed by the courts in habeas corpus proceedings.

16. **Aliens** ☞46—**Deportation statute not to be extended by construction.**

Act Oct. 16, 1918, § 1 (Comp. St. Ann. Supp. 1919, § 4289¼b[1]), authorizing deportation of aliens who are members of an organization advocating the overthrow of the government by force or violence, is not to be extended by construction, since it is the traditional policy of the United States to admit all aliens, except specially designated classes, and it is for Congress to determine our national policy toward other peoples.

17. **Aliens** ☞40—**Constitutional law** ☞90, 91—**Deportation statute to be construed in accordance with spirit of Constitution, including right to freedom of speech, press, and assemblage.**

Statutory restrictions on immigration, like all other statutes, are, if possible, to be construed in accordance with the spirit as well as within the letter of the Constitution, including its declaration for freedom of speech, press, and assemblage.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

18. **Aliens ☜46—Use of general strike is not attempt to "overthrow government by force or violence."**

An organization for the avowed purpose of changing our government by the use of a general strike is not seeking the overthrow of the government by force or violence, within Act Oct. 16, 1918, § 1 (Comp. St. Ann. Supp. 1919, § 4289¼b[1]), even if "force," as used therein, is not synonymous with "violence," since it does not mean force of the religious, moral, political, or economic kind, especially in view of the context, dealing with assassination, destruction of property, and similar kinds of force, and since the general trend of legislation is to protect, and not to restrict, the right to strike.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Force.]

19. **Aliens ☜46—"Overthrow" of government requires more than radical change in government.**

Within Act Oct. 16, 1918, § 1 (Comp. St. Ann. Supp. 1919, § 4289¼b[1]), authorizing deportation of alien members of organizations advocating the forcible overthrow of the government, "overthrow" means more than radical change in the form and functions of the government.

20. **Conspiracy ☜28—Party organized to overthrow government is "seditious conspiracy."**

A party organized to overthrow the government by force or violence, so that its alien members are liable to deportation, under Act Oct. 16, 1918, § 1 (Comp. St. Ann. Supp. 1919, § 4289¼b[1]), is a "seditious conspiracy," punishable, under Criminal Code, § 6 (Comp. St. § 10170), and all its members, citizens as well as aliens, should be tried in criminal courts.

21. **Aliens ☜54—Evidence held to show possibility that government spies influenced Communist program.**

Where the evidence showed that government informers were sufficiently influential in the Communist party to secure meetings on desired dates and there was no explanation of the extent or purpose of their activities, there is at least ground for suspicion that they influenced the wording of a party manifesto issued after they began their work, so that it should not be made the basis of determining the liability of alien members of the party to deportation without careful investigation by the Department of Labor.

22. **Aliens ☜54—Hearing of aliens who admitted Communism held fair.**

The hearing of certain aliens who admitted membership in the Communist party and knowledge of its principles and aims *held* to have been sufficiently fair to warrant their deportation, if that party was one proscribed by Act Oct. 16, 1918, § 1 (Comp. St. Ann. Supp. 1919, § 4289¼b[1]), even though there may have been some errors in the procedure.

23. **Aliens ☜54—Hearing of aliens who did not understand purpose of Communist party held unfair.**

Hearings in proceedings for the deportation of aliens who were members of the Communist party, but who had become such by transfer of local organizations from the Socialist to the Communist party, and who had no understanding of the purpose and aims of the latter, which proceedings were based on admissions after arrest without warrant and on documents procured by search without warrants, *held* unfair and to entitle the aliens to discharge under habeas corpus proceedings.

24. **Aliens ☜46—To warrant deportation, "membership" in proscribed organizations must be real.**

The "membership" in an organization for the overthrow of the government by force or violence, which subjects an alien to deportation, under Act Oct. 16, 1918, § 1 (Comp. St. Ann. Supp. 1919, § 4289¼b[1]), must be a real membership or an actual affiliation with the organization, not a membership acquired by a mere change of name or affiliation of their

☜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

local organization without intention to adopt the principles of the new organization.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Membership.]

**25. Aliens ⬤⟳54—Release for unfairness of hearing is without prejudice to new hearing.**

Where, under the peculiar circumstances of this case, aliens, held under warrant for deportation, are entitled to their discharge because the hearings were unfair and denied due process of law, such discharge is without prejudice to new proceedings for deportation for any cause, existent or not.

**26. Aliens ⬤⟳54—Discretion as to bail reviewable only if abused.**

The discretion of the Secretary of Labor, under Immigration Law, § 20 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 4289¼k), to release aliens on bail not less than $500, pending hearing and final decision, is one with which the courts ordinarily cannot interfere, either as to the granting or refusing of bail or as to the amount, but such interference is warranted where there is an abuse of the power given.

**27. Habeas corpus ⬤⟳107—Requirement of extraordinary bail held abuse of discretion.**

Where the general order of the Secretary provided for release of alien pending deportation proceedings on bail in the sum of $1,000, unless the local authorities otherwise recommended, the requirement of bail in the sums of $10,000 or $5,000 from aliens held, pending proceedings in which the department of police was improperly interfering, and where there was no evidence that the aliens, if released, would have endangered in any way the public safety, or would not have appeared when required, was an abuse of discretion, and the court, in habeas corpus proceedings, can admit them to bail in the sum of $500.

**28. Aliens ⬤⟳54—Cannot be held an unreasonable time without hearing.**

Aliens arrested for deportation cannot be held in custody for an unreasonable length of time without a hearing, and the fact that a large number of arrests were made by the department at the same time, so that speedy hearings were impossible, does not justify the delay.

Petitions for writs of habeas corpus, one by William Thomas Colyer and others, and three by Morris Katzeff, against Henry J. Skeffington, Commissioner of Immigration, to procure the release of 20 aliens held under warrants of arrest or for deportation. Aliens held under warrants for deportation discharged, and those held under warrant of arrest released on bail.

Lawrence G. Brooks and Morris Katzeff, both of Boston, Mass., for petitioners.

Felix Frankfurter, of New York City, and Zechariah Chafee, Jr., of Cambridge, Mass., amici curiæ.

Lewis Goldberg, Asst. U. S. Atty., of Boston, Mass., for respondent.

ANDERSON, Circuit Judge. These are petitions for habeas corpus brought by or in behalf of 20 aliens against the Commissioner of Immigration at Boston. They were heard together; they fall into two classes: William T. Colyer, Amy Colyer, Frank Mack, Lew Bonder, Frank Matchian, Tehon Lanovoy, Trofim Yarmoluk, Anton Harbatuk, Anton Gessewich, Fred Chaika, Koly Honchereoff, Adam Musky, and Sedar Serachuk have, after appeal to the Secretary of Labor, been ordered by him to be deported. Seven of the aliens were at the time

of the filing of the petitions held at Deer Island by the respondent in default of bail, fixed, on recommendation of Assistant Commissioner of Immigration Sullivan, as follows:

Ivan T. Hyrnchuk.............................................$10,000
Theodore Pashukoff ............................................ 5,000
William Maches ................................................ 5,000
William Chriupko .............................................. 5,000
Joe Sinkus ................................................... 5,000
Wladimir Scrachuk ............................................. 5,000
Samuel Drakewich .............................................. 5,000

Near the end of the long hearing, in which it clearly appeared that none of the aliens were in any way involved, by the use of bombs, guns, or other weapons, in plans of injuring persons or property, and that the cases could not for many months be finally disposed of, the writs were ordered issued, and all the petitioners admitted by this court to bail in the sum of $500 each. No such responsibility would have been taken by the court if there had been a scintilla of evidence that any alien thus set at liberty was committed in any way to acts of force or violence against person or property.

At the opening of the trial the cases were said by counsel on both sides to be, in many important aspects, test cases of the legality of an undertaking of the government to deport several thousand aliens alleged to be proscribed by a portion of section 1 of the Act of October 16, 1918 (Comp. St. Ann. Supp. 1919, § 4289¼b[1]), as follows:

"That * * * aliens who are members of or affiliated with any organization that entertains a belief in, teaches, or advocates the overthrow by force or violence of the government of the United States * * * shall be excluded from admission into the United States."

Section 2 (section 4289¼b[2]) provides for the deportation of such aliens, irrespective of the time of their entry.

The sole charge against these aliens is membership in the Communist Party or the Communist Labor Party. The proposition of the Department of Justice, adopted by the Commissioner General of Immigration, as hereafter set forth, is that membership in one of these parties is, alone, enough to bring the aliens within the purview of this provision; that both parties are committed to a scheme to overthrow our government by force or violence. In both classes of cases the petitioners attack, on grounds fatal if sustained, the validity of the proceedings instituted by the government on January 2, 1920, for their deportation.

Under such circumstances, it seemed the plain duty of this court to afford the fullest opportunity both to the petitioners and to the government to present all facts arguably pertinent, in order that there might be a record adequate for a determination of the important issues of law by the Supreme Court or the Circuit Court of Appeals. The case therefore has been heard before me at length on 15 days. The transcript of parol evidence and arguments makes a record of nearly 1,600 pages. In addition, there is a large mass of exhibits. The petitioners were permitted to present practically all the evidence which, in their view, might sustain their contentions. Their counsel

have also had the assistance of Professors Felix Frankfurter and Zechariah Chafee, Jr., of the Harvard Law School, who, as amici curiæ, have appeared in association with counsel for the petitioners, and assisted both in the presentation of the evidence and in the argument of controlling questions of law.

I desire to express my appreciation of their unselfish and highly professional endeavors to assist in the proper determination of a cause involving, directly, the fundamental rights of a large number of aliens but poorly equipped with means or knowledge to protect their rights, and, indirectly, questions of far-reaching and general importance to all, whether citizens or aliens.

It should be added that, at the close of the hearing, Assistant United States Attorney Lewis Goldberg, who has presented the government's side of the cause with very great ability, urging every possible authority offering any support for the government's proceedings, expressed himself as fully content with the opportunity given the government to present all evidence and arguments which might sustain its view of the law and the facts. No counsel from the departments in Washington has rendered the slightest assistance on the law or the facts.

In such a case, based upon such a record, it is the obvious duty of the trial judge in his opinion to excerpt from the bulky record the evidence—particularly the documentary evidence—of most vital importance, to make relevant findings of fact based upon all the evidence, and thus to present, for the decision of the issues of law for the court above, a record of the facts, accurate, adequate, and yet as brief as possible. Under such circumstances, the opinion of the trial court is obviously, in scope and purpose, closely analogous to the function performed by an adequate master's report. With such a case, presented on such a record, actual brevity has been found impossible of realization. This writing is unpleasantly, but necessarily, lengthy.

### Controlling Legal Principles.

A preliminary statement of the well-settled and familiar principles of law on which all of these habeas corpus cases involving the exclusion or deportation of aliens depend will bring into clearer perspective the field of facts in which this court must perform its most important duties.

[1] It has been repeatedly held that "the right to exclude or to expel all aliens, or any class of aliens, absolutely or upon certain conditions, in war or in peace," is "an inherent and inalienable right of every sovereign and independent nation, essential to its safety, its independence, and its welfare;" that this "power to exclude and to expel aliens, being a power affecting international relations, is vested in the political departments of the government, and is to be regulated by treaty or by act of Congress, and to be executed by the executive authority according to the regulations so established, except so far as the judicial department has been authorized by treaty or by statute, or is required by the paramount law of the Constitution, to intervene." See Fong Yue Ting v. United States, 149 U. S. 698, 711, 713, 13

Sup. Ct. 1016, 1021 (37 L. Ed. 905), in which Mr. Justice Gray elaborately reviews the authorities; The Chinese Exclusion Cases, 130 U. S. 581, 9 Sup. Ct. 623, 32 L. Ed. 1068; Nishimura Ekiu v. United States, 142 U. S. 651, 659, 12 Sup. Ct. 336, 35 L. Ed. 1146; Chin Yow v. United States, 208 U. S. 8, 28 Sup. Ct. 201, 52 L. Ed. 369; Lewis v. Frick, 233 U. S. 291, 34 Sup. Ct. 488, 58 L. Ed. 967.

Otherwise stated, there is no constitutional limit to the power of Congress to exclude or expel aliens. An invitation once extended to the alien to come within our borders may be withdrawn. He has no vested right to remain. This was expressly adjudicated in the Chinese Exclusion Cases, 130 U. S. 581, 9 Sup. Ct. 623, 32 L. Ed. 1068, in which the Supreme Court unanimously held that the fact that a Chinese laborer had legally entered the United States conferred upon him no right of which he could not be deprived by a subsequent act of Congress.

[2] It is also familiar and perfectly well-settled law that the courts have no jurisdiction, on habeas corpus proceedings, to interfere with the proceedings in the Department of Labor concerning the exclusion or the expulsion of aliens, unless and until there is some error of law in that department. Unless the proceedings in that department are unfair, thus lacking some of the essential elements of due process of law, or are based upon some misconstruction of the statute or disregard of the rules made pursuant thereto, or on other vitiating error of law, the courts have no jurisdiction. In these habeas corpus cases, therefore, it may be said that the primary function of the court is to try, not the right of the alien to enter or to remain in the United States, but to try the trial of the alien in the Department of Labor; if that trial was fair and legal, even though the result was, in the opinion of the court, erroneous on the facts, the court has no right to interfere; it may not, in habeas corpus proceedings, usurp the function that Congress has delegated by statute to the Department of Labor.

[3] But, while the courts have no jurisdiction on habeas corpus to substitute their judgment on pure questions of fact for that of the Secretary of Labor, it is equally well settled that if the proceedings in the Department of Labor are shown to be unfair, or otherwise lacking in the essential elements of due process of law, or if the Secretary of Labor is proceeding on an erroneous view of the law, then the courts must review. Gegiow v. Uhl, 239 U. S. 3, 36 Sup. Ct. 2, 60 L. Ed. 114; Chin Yow v. U. S., 208 U. S. 8, 28 Sup. Ct. 201, 52 L. Ed. 369; United States v. Petkos, 214 Fed. 978, 131 C. C. A. 274. Compare American School of Magnetic Healing v. McAnnulty, 187 U. S. 94, 23 Sup. Ct. 33, 47 L. Ed. 90; Whitfield v. Hanges, 222 Fed. 745, 138 C. C. A. 199, and cases cited; Kwock Jan Fat v. White, 252 U. S. ——, 40 Sup. Ct. 566, 64 L. Ed. ——, decided June 7, 1920.

[4] While deportation proceedings are not criminal proceedings, aliens who are thereby deprived of their liberty may have their legal right to liberty tested on habeas corpus proceedings.

[5] In Whitfield v. Hanges, supra, Judge Sanborn, for the Circuit

Court of Appeals for the Eighth Circuit, states the principle as follows:

"A full and fair hearing on the charges which threaten his deportation, and an absence of all abuse of discretion and arbitrary action by the inspector, or other executive officer, are indispensable to the lawful deportation of an alien. Where, by the abuse of the discretion, or the arbitrary action of the inspector or other executive officer, or without a full and fair hearing, an alien is deprived of his liberty, or is about to be deported, the power is conferred and the duty is imposed upon the courts of the United States to issue a writ of habeas corpus and relieve him. The Japanese Immigrant Case, 189 U. S. 86, 100, 101, 23 Sup. Ct. 611, 47 L. Ed. 721; Chin Yow v. United States, 208 U. S. 8, 10, 12, 13, 28 Sup. Ct. 201, 52 L. Ed. 369; Low Wah Suey v. Backus, 225 U. S. 460, 468, 32 Sup. Ct. 734, 56 L. Ed. 1165; Ex parte Petkos (D. C.) 212 Fed. 275; United States v. Chin Len, 187 Fed. 544, 109 C. C. A. 310; United States v. Williams (D. C.) 185 Fed. 598, 604; United States v. Williams (D. C.) 193 Fed. 228."

Aliens have constitutional rights. The Fourth, Fifth, Sixth, and Fourteenth Amendments are not limited in their application to citizens. They apply generally to all persons within the jurisdiction of the United States. See Yick Wo v. Hopkins, 118 U. S. 356, 6 Sup. Ct. 1064, 30 L. Ed. 220.

In this case an ordinance of San Francisco, made under a state law, was held, as enforced, to involve an unconstitutional discrimination against Chinese laundrymen then lawfully in San Francisco. The court, by Mr. Justice Matthews, said:

"The Fourteenth Amendment to the Constitution is not confined to the protection of citizens. It says: 'Nor shall any state deprive any person of life, liberty, or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.' These provisions are universal in their application, to all persons within the territorial jurisdiction, without regard to any differences of race, of color, or of nationality; and the equal protection of the laws is a pledge of the protection of equal laws. It is accordingly enacted by section 1977 of the Revised Statutes, that 'all persons within the jurisdiction of the United States shall have the same right in every state and territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.' The questions we have to consider and decide in these cases, therefore, are to be treated as involving the rights of every citizen of the United States equally with those of the strangers and aliens who now invoke the jurisdiction of the court."

In Wong Wing v. United States, 163 U. S. 228, 16 Sup. Ct. 977, 41 L. Ed. 140, it was held that Congress could not constitutionally promote its policy of excluding Chinese aliens by administrative orders by subjecting such aliens, found illegally within the United States, to infamous punishment at hard labor, or by confiscating their property, without providing a judicial trial to establish the guilt of the accused. In the opinion it is pointed out, as held in Fong Yue Ting v. United States, 149 U. S. 730, 13 Sup. Ct. 1029, 37 L. Ed. 905, that an—

"order of deportation is not a punishment for crime. * * * It is but a method of enforcing the return to his own country of an alien who has not complied with the conditions upon the performance of which the government

of the nation, acting within its constitutional authority and through the proper departments, has determined that his continuing to reside here shall depend."

In that opinion the language above quoted from the opinion in Yick Wo v. Hopkins is repeated; the court, by Mr. Justice Shiras, adding:

"Applying this reasoning to the Fifth and Sixth Amendments, it must be concluded that all persons within the territory of the United States are entitled to the protection guaranteed by those amendments, and that even aliens shall not be held to answer for a capital or other infamous crime, unless on a presentment or indictment of a grand jury, nor be deprived of life, liberty, or property without due process of law."

In the Japanese Immigrant Case, 189 U. S. 86, 100, 23 Sup. Ct. 611, 614 (47 L. Ed. 721), the court, by Mr. Justice Harlan, said:

"But this court has never held, nor must we now be understood as holding, that administrative officers, when executing the provisions of a statute involving the liberty of persons, may disregard the fundamental principles that inhere in 'due process of law' as understood at the time of the adoption of the Constitution."

One of the most fundamental of the "body of liberties" guaranteed the inhabitants of the United States by our Constitution is freedom from unreasonable search and seizure, and from arrest without due process. The historic basis of these liberties is elaborately dealt with by Mr. Justice Bradley in Boyd v. United States, 116 U. S. 616, 6 Sup. Ct. 524, 29 L. Ed. 746. That case involved merely 35 cases of plate glass, seized by the collector of the port as forfeited to the United States under section 12 of the Act of June 22, 1874 (18 Stat. 188), which required the compulsory production of private papers to be used as evidence against the alleged owner. This statute was held repugnant to the Fourth and Fifth Amendments. In a long opinion Mr. Justice Bradley pointed out that the Fourth Amendment to the Constitution, prohibiting unreasonable searches and seizures, had its roots in the struggle for liberty in the Colonies, one famous incident of which was the attack in Boston in 1761 by James Otis on the writs of assistance issued to revenue officers, "empowering them in their discretion to search suspected places for smuggled goods." See 116 U. S. 625, 6 Sup. Ct. 529, 29 L. Ed. 746. The learned justice also points out that these guaranties of liberty in our Constitution were grounded upon the great decision of Lord Camden in 1765 in the case of Entick v. Carrington, 19 Howell's State Trials, 1029, growing out of the controversy with John Wilkes and the attempt of the English government, through Lord Halifax, Secretary of State, to obtain evidence to convict Wilkes of the charge of criminal libel by searching private houses for the discovery and seizure of books and papers.

"By authority of the Secretary's warrant Wilkes' house was searched, and his papers were indiscriminately seized. For this outrage he sued the perpetrators and obtained a verdict of £1,000 against Wood, one of the party who made the search, and £4,000 against Lord Halifax, the Secretary of State who issued the warrant. * * * Lord Camden pronounced the judgment of the court in Michaelmas term, 1765, and the law as expounded by him has been regarded as settled from that time to this, and his great judgment on

that occasion is considered as one of the landmarks of English liberty. It was welcomed and applauded by the lovers of liberty in the colonies as well as in the mother country. It is regarded as one of the permanent monuments of the British Constitution, and is quoted as such by the English authorities on that subject down to the present time."

Compare United States v. Wong Quong Wong (D. C.) 94 Fed. 832; Moy Wing Sun v. Prentis, 234 Fed. 24, 148 C. C. A. 40; Robinson v. Richardson, 13 Gray (Mass.) 454; In re Pacific Ry. Co. (C. C.) 32 Fed. 251.

The learned justice also, in a footnote, refers to 3 May's Constitutional History of England (American Edition, vol. 2) c. 11, for an illuminating discussion of the historic struggle for liberty in England, including the use made of the spy system. See page 39, where May says:

"Next in importance to personal freedom is immunity from suspicions, and jealous observation. Men may be without restraints upon their liberty; they may pass to and fro at pleasure; but if their steps are tracked by spies and informers, their words noted down for crimination, their associates watched as conspirators, who shall say that they are free? Nothing is more revolting to Englishmen than the espionage which forms part of the administrative system of continental despotism. It haunts men like an evil genius, chills their gaiety, restrains their wit, casts a shadow over their friendships, and blights their domestic hearth. The freedom of a country may be measured by its immunity from this baleful agency. Rulers who distrust their own people must govern in a spirit of absolutism, and suspected subjects will be ever sensible of their bondage."

See, for a careful review of the history of the spy system in industry and in dealing with political movements, Robert C. Hunter's book on "Violence in the Labor Movement," and John Graham Brooks' "Labor's Challenge to the Social Order."

See, also, an account of James Otis' argument against the writs of assistance, written by Mr. Justice Gray and found in the appendix to Quincy's Reports; also, on the same subject, 2 Works of John Adams, appendix A, pp. 523 to 525. One main point made by Otis was that these writs, though issued on judicial process, were not returnable to any court. They thus authorized petty officers to enter homes, etc., without requiring them to make return of their doings. This, Otis said, "was tyranny, destroying the freedom of one's house."

The principles laid down in these earlier authorities have not passed into oblivion or disuse. They are still the law of this nation. See Silverthorne Lumber Co., Inc., v. United States, 251 U. S. 385, 40 Sup. Ct. 182, 64 L. Ed. ——, decided January 26, 1920, opinion by Mr. Justice Holmes. This was a proceeding to punish Silverthorne for contempt for refusing to produce books and papers on a summons duces tecum. Refusal was grounded on the rights of the parties under the Fourth Amendment. The Silverthornes were arrested, and, while in custody, "representatives of the Department of Justice and the United States marshal, without a shadow of authority, went to the office of their company and made a clean sweep of all the books, papers, and documents found there." These were subsequently, on petition to the District Court, ordered returned. But meantime the government had

had them photographed, and used the photographs in obtaining an indictment. On subpœna duces tecum, the production of the originals was then sought. Mr. Justice Holmes said (page 391 of 251 U. S. at page 682 of 40 Sup. Ct. [64 L. Ed. ——]) :

"The proposition could not be presented more nakedly. It is that although of course its seizure was an outrage which the government now regrets, it may study the papers before it returns them, copy them, and then may use the knowledge that it has gained to call upon the owners in a more regular form to produce them; that the protection of the Constitution covers the physical possession but not any advantages that the government can gain over the object of its pursuit by doing the forbidden act. Weeks v. United States, 232 U. S. 383, to be sure, had established that laying the papers directly before the grand jury was unwarranted, but it is taken to mean only that two steps are required instead of one. In our opinion such is not the law. It reduces the Fourth Amendment to a form of words. 232 U. S. 393. The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the court, but that it shall not be used at all. Of course this does not mean that the facts thus obtained become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others, but the knowledge gained by the government's own wrong cannot be used by it in the way proposed. The numerous decisions, like Adams v. New York, 192 U. S. 585, holding that a collateral inquiry into the mode in which evidence has been got will not be allowed when the question is raised for the first time at the trial, are no authority in the present proceeding, as is explained in Weeks v. United States, 232 U. S. 383, 394, 395. Whether some of those decisions have gone too far or have given wrong reasons it is unnecessary to inquire; the principle applicable to the present case seems to us plain. It is stated satisfactorily in Flagg v. United States, 233 Fed. Rep. 481, 483. In Linn v. United States, 251 Fed. Rep. 476, 480, it was thought that a different rule applied to a corporation, on the ground that it was not privileged from producing its books and papers. But the rights of a corporation against unlawful search and seizure are to be protected even if the same result might have been achieved in a lawful way.'

If a corporation has such rights, a fortiori, a person, though an alien, is protected.

In the Flagg Case, 233 Fed. 481, 147 C. C. A. 367, cited supra with approval by Mr. Justice Holmes, it appeared that Flagg's books and papers had been illegally seized without warrant and used as the basis of an indictment against Flagg for using the mails in a scheme to defraud, in which the defendant was convicted. The judgment was reversed as grounded on evidence unconstitutionally obtained.

In Weeks v. United States, 232 U. S. 383, 34 Sup. Ct. 341, 58 L. Ed. 652, L. R. A. 1915B, 834, Ann. Cas. 1915C, 1177, Mr. Justice Day, speaking for a unanimous court, said, as to the Fourth Amendment:

"The effect of the Fourth Amendment is to put the courts of the United States and federal officials, in the exercise of their power and authority, under limitations and restraints as to the exercise of such power and authority, and to forever secure the people, their persons, houses, papers and effects against all unreasonable searches and seizures under the guise of law. This protection reaches all alike, whether accused of crime or not, and the duty of giving to it force and effect is obligatory upon all intrusted under our federal system with the enforcement of the laws."

Other illustrations of the application by the courts of these general principles of liberty to the protection of the rights of aliens are:

United States v. Williams (D. C.) 185 Fed. 598, Roux v. Commissioner of Immigration, 203 Fed. 413; 121 C. C. A. 523; Moy Suey v. United States, 147 Fed. 697, 78 C. C. A. 85; Pang Sho Yin v. United States, 154 Fed. 660, 83 C. C. A. 484; Fong Gum Tong v. United States, 192 Fed. 320, 112 C. C. A. 572.

### Administration of Immigration Laws Vested by Congress in Department of Labor.

[6] The administration of the immigration laws has been intrusted by Congress to the Department of Labor—not to the Department of Justice. The latter department has no more legal right or power to deal with the exclusion or the expulsion of aliens than has the Department of the Interior. The department of Justice prosecutes for crime. But deportation proceedings are not criminal proceedings. Pang Sho Yin v. United States, supra.

There are obvious reasons why Congress delegated the important and delicate functions of excluding and expelling aliens to the Labor Department. This department is charged with certain functions pertaining peculiarly to human welfare; it exercises large powers over millions of persons, many of them poor, comparatively helpless, and unacquainted with our language and institutions. As the functions of the Department of Justice and the Department of Labor are radically different, the official personnel of the two departments would naturally have different methods of procedure. But, without elaborating reasons, the mandate of Congress, intrusting immigration matters to the Labor Department, is binding upon all government departments, including the courts. The Commissioner General of Immigration is a subordinate in the Department of Labor.

[7] Under the immigration laws authority is vested in the Secretary of Labor to provide rules and regulations for enforcing the provisions of the acts. Of these rules, which have the effect of law, the court must take judicial notice. Caha v. United States, 152 U. S. 211, 14 Sup. Ct. 513, 38 L. Ed. 415. They are binding upon the Department of Labor as part of the law of the land. For present purposes, the most important rule is rule 22, entitled "Arrest and Deportation on Warrant."

Subdivision 2 of rule 22 provides:

"Officers shall make a thorough investigation of all cases when they are credibly informed or have reason to believe that a specified alien in the United States is subject to arrest and deportation on warrant. All such cases, by whomsoever discovered, shall be reported to the immigration officer stationed nearest the place where the alien is found to be."

The word "officers," used in this subdivision 2, means immigration inspectors. They are civil service appointees, most of them of large experience in this sort of work.

Subdivision 3 of the same rule is as follows:

"The application must state facts showing prima facie that the alien comes within one or more of the classes subject to deportation after entry, and, except in cases in which the burden of proof is upon the alien (Chinese) involved, should be accompanied by some substantial supporting evidence. If

the facts stated are within the personal knowledge of the inspector reporting the case, they need not be in affidavit form. But if based upon statements of persons not sworn officers of the government (except in cases of public charges covered by subdivision 4 hereof), the application should be accompanied by the affidavit of the person giving the information or by a transcript of a sworn statement taken from that person by an inspector. In all cases shown in subdivision 1 to be subject to a time limitation the application must be accompanied by a certificate of landing, to be obtained from the immigration officer in charge at the port where landing occurred, unless entry without inspection within such limitation is confessed, or a reason given for its absence. In the absence of such certificate, effort should be made to supply the principal items of information mentioned in the blank form provided for such certificate. Telegraphic application may be resorted to only in case of necessity or when some substantial interest of the government would be subserved thereby, and must state (a) that the usual written application is being forwarded by mail, and (b) the substance of the facts and proof therein contained. The code supplied by the department should be used whenever practicable."

Subdivision 5 in the form in which the rule was before the amendment of December 20, 1919, hereinafter referred to, so far as now material is as follows:

"(a) Upon receipt of a telegraphic or written warrant of arrest the alien shall be taken before the person or persons therein named or described and granted a hearing to enable him to show cause, if any there be, why he should not be deported. Pending determination of the case, in the discretion of the immigration officer in charge, he may be taken into custody or allowed to remain in some place deemed by such officer secure and proper, except that in the absence of special instructions an alien confined in an institution shall not be removed therefrom until a warrant of deportation has been issued and is about to be served.

"(b) At the beginning of the hearing under the warrant of arrest the alien shall be allowed to inspect the warrant of arrest and all the evidence on which it was issued, and shall be apprised that he may be represented by counsel. The alien shall be required then and there to state whether he desires counsel or waives the same, and his reply shall be entered on the record. If counsel be selected, he shall be permitted to be present during the conduct of the hearing, and to offer evidence to meet any evidence presented or adduced by the government. Objections and exceptions of counsel shall not be entered on the record, but may be presented by him in accompanying brief. If during the hearing it shall appear to the examining inspector that there exists a reason additional to those stated in the warrant of arrest why the alien is in the country in violation of law, the alien's attention shall be directed to the facts which constitute such reason, and he shall be given an opportunity to show cause why he should not be deported therefor.

"(c) At the close of the hearing the full record shall be forwarded to the bureau, together with any written argument submitted by counsel and the recommendations of the examining officer and the officer in charge, for determination as to whether or not a deportation warrant shall issue."

Subdivision 6 provides that, pending deportation proceedings, the alien may be released on a $500 bond unless different instructions are given by the department.

Subdivision 10 is as follows:

"When it is necessary to detain or hold arrested women and girls they shall not be incarcerated by immigration officials in jails or other similar places unless such incarceration is absolutely unavoidable; but if there is not attached to the immigration station or quarters a room suitable for such

purpose, and if such aliens are not already being held in some proper institution, arrangements shall be made for their detention by some philanthropic or other similar society, preferably under the control of organizations or persons of the same nationality and religion as of the detained aliens."

By section 17 of the Act of February 5, 1917 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 4289¼ii), provision is made for the appointment of boards of inquiry to deal with deportation matters, including the right of appeal by the alien to the Secretary of Labor. Appeals are heard "solely upon the evidence adduced before the Board of Special Inquiry."

In rule 17 are provisions for the reopening of cases for additional evidence, a provision possibly applicable in some aspects of this case.

[8, 9] From the foregoing it is apparent that the records upon which the decisions of the Secretary of Labor are based are under the provisions of these rules intended to be made in summary, but fair and adequate, fashion by real trials before immigration inspectors. Due process of law requires that these trials should be fair, unbiased, dispassionate. They may be summary, lacking in formalities of judicial procedure; but they must be conducted in an honest and reasonably intelligent attempt to ascertain and report the truth; otherwise the alien is deprived of the rights which the statutes of Congress contemplate that he shall have, including the right to have his appeal passed on by the Secretary of Labor with an adequate and truthful record before him. Moreover, an unfair or otherwise misleading record is as much a fraud upon the law and upon the Secretary of Labor as upon the alien. It is as much the duty of the Department of Labor to admit aliens impliedly invited by Congress into this country as it is to exclude or expel those proscribed by Congress. The general policy of the United States towards immigrants has been to admit and to welcome all, except specifically described and limited undesirables. No executive department has any right by strained construction to substitute its theories for those adopted by the national Legislature.

One important inquiry in this case is as to whether the records in the case of 13 of the aliens who have been ordered deported, were made by labor inspectors acting soberly, conscientiously, and with an unbiased and uncontrolled attempt to find and report the facts on which the rights of these aliens depend. The petitioners urge that in the proceedings here brought in question the Department of Labor abdicated its functions; that those functions were usurped by the Department of Justice, through its Bureau of Investigation, and that the proceedings are therefore void ab initio; that if not absolutely void, at any rate the trials by the inspectors were under such circumstances as to prevent a fair, impartial, conscientious attempt to find and report the facts upon which the rights of many of the aliens must depend. The methods adopted are contended to have deprived the petitioners, many of whom have but a meager knowledge of English and scant education, of any fair opportunity to have their real status determined. This contention makes it necessary to set forth in considerable detail

the facts under which the petitioners, and hundreds of other aliens, were arrested and held for trial.

## Initiation and Conduct of the Raid in New England.

On December 27, 1919, Burke, Chief of the Bureau of Investigation of the Department of Justice in Washington, sent the following letter to Kelleher, head of the local bureau in Boston:

"Department of Justice, Bureau of Investigation.

"Washington, December 27, 1919.

"Strictly Confidential.

"Geo. E. Kelleher, Esq., Box 3185, Boston, Mass.—Dear Sir: I have already transmitted to you two briefs prepared in this department upon the Communist Party of America and the Communist Labor Party with instructions that these briefs be carefully examined and studied for the purpose of familiarizing yourself and the agents under your direction with the principles and tactics of these two respective organizations.

"You have submitted to me affidavits upon various individuals connected with these respective organizations, stating that these persons are aliens and members of the organizations referred to. I have transmitted to the Commissioner General of Immigration the affidavits submitted by you with the request that warrants of arrest be issued at once. This action is now being taken by the Bureau of Immigration and warrants of arrest are being prepared and will shortly be forwarded to the immigration inspector of your district.

"Briefly the arrangements which have been made are that the warrants will be forwarded to the immigration inspector who will at once communicate with you and advise you of the names of the persons for whom he has received warrants. You should then place under surveillance, where practicable, the persons mentioned, and at the appointed time you will be advised by me by wire when to take into custody all persons for whom warrants have been issued.

"At the time of the apprehension of these persons every effort should be made by you to definitely establish the fact that the persons arrested are members of either the Communist Party of America or the Communist Labor Party. I have been reliably informed that instructions have been issued from the headquarters of each of these organizations to their members that they are to refuse to answer any questions put to them by any federal officers, and are to destroy all evidence of membership or affiliation with their respective organizations. It is therefore of the utmost importance that you at once make every effort to ascertain the location of all of the books and records of these organizations in your territory and that the same be secured at the time of the arrests. As soon as the subjects are apprehended, you should endeavor to obtain from them, if possible, admissions that they are members of either of these parties, together with any statement concerning their citizenship status. I cannot impress upon you too strongly the necessity of obtaining documentary evidence proving membership.

"Particular efforts should be made to apprehend all of the officers of either of these two parties if they are aliens; the residences of such officers should be searched in every instance for literature, membership cards, records, and correspondence. The meeting rooms should be thoroughly searched and an effort made to locate the charter of the Communist Party of America or the Communist Labor Party, under which the local organization operates, as well as the membership and financial records, which, if not found in the meeting rooms of the organization, will probably be found in the homes of the recording and financial secretaries, respectively. All literature, books, papers, and anything hanging on the walls should be gathered up; the ceilings and partitions should be sounded for hiding places. After obtaining any documentary evidence, the same should be wrapped in packages and marked thereon, the

location of the place, and the name of the persons obtaining the evidence, and the contents of each package.

"Violence towards any aliens should be scrupulously avoided. Immediately upon apprehending an' alien, he should be thoroughly searched. If found in groups in meeting rooms, they should be lined up against the wall and there searched; particular effort being given to finding the membership book, in which connection the search of the pockets will not be sufficient. In no instance should money or other valuables be taken from the aliens. All documentary evidence taken from an alien should be placed in an individual envelope, provided for the purpose, which envelope should be marked showing the contents contained in the same, whether they were found in the possession of the alien or in his room, and if in the latter the address of the house should be given as well as the name of the alien and the officer who obtained the evidence. A duplicate record should be kept of all evidence thus obtained. At the time of the transfer of the alien to the immigration inspector, you should also turn over to the immigration inspector the original evidence obtained in the particular case, plainly marked so that there may be no complaint by the immigration officers as to the manner in which evidence has been collected by the agents of this bureau.

"I have made mention above that the meeting places and residences of the members should be thoroughly searched. I leave it entirely to your discretion as to the method by which you should gain access to such places. If, due to the local conditions in your territory, you find that it is absolutely necessary for you to obtain a search warrant for such premises, you should communicate with the local authorities a few hours before the time for the arrests is set and request a warrant to search the premises.

"Under no conditions are you to take into your confidence the local police authorities or the state authorities prior to the making of the arrests. It is not the intention nor the desire of this office that American citizens, members of the two organizations, be arrested at this time. If, however, there are taken into custody any American citizens through error, and who are members of the Communist Party of America or the Communist Labor Party, you should immediately refer their cases to the local authorities.

"It may be necessary, in order to successfully make the arrests, that you obtain the assistance of the local authorities at the time of the arrests. This action should not be taken, unless it is absolutely necessary; but I well appreciate that where a large number of arrests are to be made it may be impossible for the same to be made by special agents of this department, in which event you are authorized to request the assistance of the local police authorities. Such assistance should not be requested until a few hours before the time set for the arrests, in order that no 'leak' may occur. It is to be distinctly understood that the arrests made are being made under the direction and supervision of the Department of Justice.

"For your own personal information, I have to advise you that the tentative date fixed for the arrests of the Communists is Friday evening, January 2, 1920. This date may be changed, due to the fact that all of the immigration warrants may not be issued by that time. You will, however, be advised by telegraph as to the exact date and hour when the arrests are to be made. If possible, you should arrange with your under-cover informants to have meetings of the Communist Party and Communist Labor Party held on the night set. I have been informed by some of the bureau officers that such arrangements will be made. This, of course, would facilitate the making of the arrests.

"On the evening of the arrests this office will be open the entire night, and I desire that you·communicate by long distance to Mr. Hoover any matters of vital importance or interest which may arise during the course of the arrests. You will possibly be given from seven (7) o'clock in the evening until seven (7) o'clock in the morning to conclude the arrests and examinations. As pointed out previously, the grounds for deportation in these cases will be based solely upon membership in the Communist Party of America or the Communist Labor Party and for that reason it will not be necessary for you to **go**

in detail into the particular activities of the persons apprehended. It is, however, desirable that wherever possible you should obtain additional evidence upon the individuals, particularly those who are leaders and officers in the local organizations. The immigration inspector will be under instructions to co-operate with you fully, and I likewise desire that you co-operate in the same manner with the immigration inspector at the time of the arrests, as well as following the .arrests. At the hearings before the immigration inspector you should render any and all reasonable assistance to the immigration authorities, both in the way of offering your services to them and the services of any of your stenographic force. It is of the utmost necessity that these cases be expedited and disposed of at the earliest possible moment and for that reason stenographic assistance and any assistance necessary should be rendered by you to the immigration inspectors. An excellent spirit of co-operation exists between the Commissioner General of Immigration and this department in Washington and I desire that the same spirit of co-operation between the field officers of this bureau and the field officers of the Bureau of Immigration also exist.

"I desire that the morning following the arrests you should forward to this office by special delivery, marked for the 'Attention of Mr. Hoover' a complete list of the names of the persons arrested, with an indication of residence, or organization to which they belong, and whether or not they were included in the original list of warrants. In cases where arrests are made of persons not covered by warrants, you should at once request the local immigration authorities for warrants in all such cases and you should also communicate with this office at the same time. I desire also that the morning following the arrests that you communicate in detail by telegram, 'Attention of Mr. Hoover,' the results of the arrests made, giving the total number of persons of each organization taken into custody, together with a statement of any interesting evidence secured.

"The above cover the general instructions to be followed in these arrests and the same will be supplemented by telegraphic instructions at the proper time.

"Very truly yours,                              Frank Burke,
                                    "Assistant Director and Chief."

This document is to be read in connection with another document issued two days later by Caminetti, Commissioner General of Immigration, to the Commissioner of Immigration at Boston:

"Strictly Confidential.    *    *    *

"Commissioner of Immigration, Boston, Mass.: The bureau is inclosing herewith 306 warrants of arrest covering aliens to be found in your jurisdiction. The names of these aliens together with the places at which they are located, or the particular agent of the Department of Justice through whom they can be located, are set forth in the accompanying list. Prima facie evidence that each and every one of these aliens is a member of the Communist Party of America or of the Communist Labor Party has been secured by agents of the Department of Justice and placed before this department in affidavit form, on the bases of which evidence these (and similar warrants for service throughout the country generally) have issued. The Department of Justice has been requested to instruct its field agents to provide the immigration officials in charge of the jurisdiction where the alien is to be found with copies of these affidavits for the completion of his files.

"For your confidential information, the Bureau has to state that the Department holds the Communist Party of America to be an organization mere membership in which brings an alien within the purview of the Act of October 16, 1918. Therefore the warrants of arrest which have issued covering aliens of this and the similar (Communist Labor Party) group contain charges pertaining to membership merely. It will accordingly be of prime importance to secure and present, in form and manner to constitute proper and usable evidence when the cases come before the Department for final consideration, evidence

265 F.—3

of membership in either one or the other of these organizations. However, individual tenets, beliefs and practices should not be overlooked, and where evidence along these lines is uncovered (or along any other line—such as entry without inspection, etc.), it should be carefully and fully developed, the alien to be placed on notice of the additional charge or charges in the manner stated in paragraph (b) of subdivision 5 of rule 22. The local agents of the Department of Justice will, it is believed, be in a position to furnish your examining officers with evidence of membership in a considerable number of cases. The connection between such evidence and the particular alien concerned should always be established on the record to the fullest extent possible.

"The Communist Labor Party is, in all essential particulars in so far as the Act of October 16, 1918, is concerned, identical with the Communist Party of America. Evidence on both organizations, in the shape of official manifestos, copies of platforms, programs, etc., will be furnished for the enlightenment of the officers who will conduct the examinations as soon as it can be prepared. Pertinent extracts from these will be properly read into the minutes of the hearings, when accorded; this, of course, in the presence of the alien, who should be appropriately questioned with respect thereto.

"All agents of the Department of Justice have been definitely and specifically instructed to co-operate with the officials of the immigration service from the outset to the final conclusion of these cases, and to afford the immigration officers every facility which they may possess to the proper, prompt, efficient, and successful handling of these cases, this even to the extent of loaning stenographic help where required. The courteous, full, and hearty co-operation of all officials of the immigration service with the Department of Justice agents is required in this common service, and should be given without stint. The success of the extensive movement which is being inaugurated in this respect hinges on this.

"For your personal information and for the personal information only of those who must plan with you (for under no consideration must a 'leak' occur due to any officer of this service), you are advised that the Department of Justice is arranging (and has so advised its appropriate field officers) to themselves accomplish the arrest of the aliens covered in the warrants which have issued on the night of January 2, 1920. The aliens will be held on local charges and opportunity afforded that night and the following day for service upon them of the administrative arrest warrants. Where bond, as prescribed in the warrants, is not furnished, the alien will be held in custody—in an immigration station where available; otherwise, in jail or other appropriate place of detention. The Department of Justice agents will assist in serving the warrants, perfecting detention arrangements, provide you with such evidence as they may possess, etc. They may not conduct the hearings prescribed by section 16, however, and such evidence as they may offer, whether in the shape of sworn statements previously secured by them, or of some other character, should be properly incorporated in the record in the usual manner, viz. by reading to the alien during the course of the hearing and questioning him with respect thereto.

"Not later than noon on the appointed day you should have a properly qualified officer or officers (where more than one can be spared) of your jurisdiction report in person armed with the warrants to be served, to the Department of Justice agent in charge of the district where the alien, or group of aliens, is to be arrested. In the event of a change of date for the general arrests you will be promptly wired to that effect. Under no circumstances should an officer proceed in the matter of the arrests except in co-operation with a Department of Justice representative. To do so would be to invite disaster.

"In the event you find, after carefully considering the matter, that you have not sufficient officers to serve the warrants in the various localities at the proper moment, please immediately wire (or phone if practicable or advisable) the bureau, when an endeavor will be made to meet the emergency by temporarily drawing upon a neighboring district which may not have been called upon to handle a considerable number of such cases.

"The bureau desires that it be promptly advised of the progress of these cases at all stages. The general result of the efforts to serve the warrants and obtain custody of the aliens, together with any other information of possible interest, should be telegraphed to the bureau at the earliest possible moment. As soon as it can be done, a list showing the aliens arrested should be prepared and mailed to it, under special delivery stamp. Additional warrants, where the necessary prima facie showing is made, may be applied for telegraphically or by mail, as the circumstances may seem to warrant, the procedure outlined in the bureau's general telegram of November 10, last, to control.

"The above cover the general instructions to govern the immigration officers in serving the warrants and conducting the hearings in these cases. They will be supplemented, telegraphically or by letter as occasion may seem to require, at the proper time.

"Respectfully, [Signed] A. Caminetti, Commissioner General.

"NOTE.—Please wire the bureau immediately upon receipt of the warrants, in order that it may know that all is in readiness.

"*Publicity must be avoided.*"

The briefs referred to in the first part of Burke's letter are printed in "Sedition, Serial 16, Hearing before the Committee of the Judiciary, H. R. 65th Cong." p. 44, Exhibit K, dealing with the status of the Communist Party, and page 98, dealing with the Communist Labor Party.

It is unnecessary here to reproduce these briefs.

The warrants referred to in Commissioner General Caminetti's letter, supra, appear to have been issued and signed by John W. Abercrombie as Acting Secretary of Labor.

These circular letter instructions sent by Burke to Kelleher were supplemented by two telegrams, each dated December 31, 1919, not apparently of vital importance, but for the sake of completeness set forth in the margin.[1]

---

[1] "Kelleher, Winthrop Bldg., Boston, Mass.: You should at once make every effort to ascertain whether any aliens connected with editorial boards your territory of Communists papers. Particularly desirous that these persons be taken into custody at time of arrests. If affidavits have not already been submitted upon these persons advise reason and delay and same should have been covered in original lot of affidavits. Desire that you at once submit copies of affidavits already forwarded to this department to local immigration inspector. Immigration inspectors under instructions communicate with you Friday morning January second for the purpose of co-operating in arrests of Communists. Warrants for arrests of all Communists have been mailed the immigration inspectors. Same will be delivered to you by immigration inspectors and you will serve these warrants at time which will later be designated. No change in present plan for arrests to be made evening January second. You will however be advised definitely as to this date. Every effort should be made by you to definitely establish fact of subject being an alien and member of Communist Party or of Communist Labor Party before arrests. Policy of bureau is to have perfect case rather than a large number of arrests. Particular attention should be given to form in which evidence is collected in order that same may be immediately turned over to immigration inspectors and hearings started at once. You should give all co-operation and assistance to immigration inspectors in these matters. No seizure of personal effects or belongings not necessary for evidence should be made by you. Documentary evidence connecting subject with party or documentary evidence on party is the only evidence which should be taken. You should be guided in securing same by local authorities, conditions and as

The quoted documents are, as to most, perhaps all, of the vital issues in this case, the most significant evidence adduced. They require detailed study, analysis, and consideration, in all their parts. They should not here be summarized. They need not here be characterized. They speak for themselves.

A single necessary conclusion from these documents may, however, here be appropriately set forth: They contemplate that the general conduct and control of this wholesale deportation undertaking shall be assumed by the Department of Justice, relegating the Department of Labor to the function, almost purely formal, of making records of cases, in effect predetermined by the Department of Justice.

pointed out in my confidential letter. You should obtain search warrants where necessary. Wire at once whether all arrangements in your territory have been made and whether your office is in condition to adequately handle the matter when ordered to proceed. Five. Burke, Chief."

"Kelleher, Winthrop Bldg., Boston, Mass.: Re arrests of Communists warrants for members of Communist Labor Party and Communist Party now in hands of immigration inspector your district. Confer at once with inspector for purpose of co-operation arrests of members covered by warrants and arrests are to be made Friday evening, January second, nineteen twenty, at nine p. m. Eastern time. No arrests should be made of persons not aliens and who are not members of or affiliated with Communist Party of America and Communist Labor Party.

"Under no condition are American citizens to be apprehended. Where any mistake nature is made and a citizen is taken into custody his case is to be immediately referred to state authorities for action. Desire that each subject taken into custody be thoroughly examined and you should prepare at once a set of questions to be asked each subject bringing out facts that subject is alien, date of arrival in the United States, and affiliation or membership with either of the parties under investigation. This statement should be taken stenographically and sworn to or affirmed by alien. Effort has been made to supply sufficient agents for the purpose of carrying out arrests in your district. Assistance of local police authorities should only be used where absolutely necessary and should not be requested until a few hours before arrests in order to avoid any leak. Of utmost importance that charge of membership be proven in each case. Where alien refuses to admit membership detailed examination should be made to bring out Communist views of subject, basing examination on contents of memorandum brief forwarded to you. Particular attention should be given to the manner in which evidence is collected in order that immigration authorities have no difficulty in handling of the hearings in the case. No arrests should be made of any persons connected with other organization than the Communist Party and the Communist Labor Party. Arrests should all be completed and examinations concluded by Saturday morning, January third, nineteen twenty, and full reports forwarded by special delivery addressed attention Mr. Hoover. I desire that you wire this office by nine a. m., Saturday morning, January third, nineteen twenty, giving number of persons arrested, nationality, and any other interesting and important pieces of evidence secured. The department in Washington will issue statement Saturday January third on national raid. Statement may be issued by you covering local situation this Saturday. Should not be given out before ten a. m. Saturday morning, January third, nineteen twenty. Make every effort to obtain perfect case and to fully conduct and conclude the arrests in your district. Five. Stop Burke, Chief. 11:55 P. M."

These instructions were summarized by Kelleher, and copies delivered to his local agents. These summarized instructions in two overlapping sets are copied in the margin.[2] It should be noted that the fifth paragraph of the first set is a distinct mandate to hold these aliens incommunicado until otherwise ordered by the Department of Justice; that the eighth paragraph contemplates the arrest of citizens and throws upon them the burden of proof of their citizenship by documentary evidence.

Thus equipped with explicit written instructions from the Department of Justice in Washington, the local Bureau of Investigation made arrangements with the police forces in the cities and towns in which the alleged Communists were for the arrests on the night of January 2, 1920. The officials, both of the Department of Justice and of the Department of Labor, described these proceedings, properly enough, as a "raid" and as "catching the Communists in the net." The word "raid" seems appropriate, and will hereafter be used in this report.

It was arranged to have at what were called "concentration points" —generally a police station—an inspector of the Labor Department;

[2] "Instructions to Agents.

"1. Each person named in the warrant shall be taken into custody.

"2. Upon taking person into custody try to obtain all documentary evidence possible to establish membership in the Communist Party, including membership cards, books, papers, correspondence, etc.

"3. Also try to secure charters, meeting minutes, membership books, due books, membership correspondence, etc., in possession of such person, which may lead to further investigations of members not yet known.

"4. All such evidence secured, as above, to be properly marked and sealed as belonging to such person, with name of arrestee, place where secured, date secured, and by whom secured marked plainly on same.

"5. Person or persons taken into custody not to be permitted to communicate with any outside person until after examination by this office and *until permission is given by this office.*

"6. Upon making arrest, person in custody to be brought to the place designated by this office for a preliminary examination.

"7. Preliminary examination to be made by agent making arrest on forms provided for that purpose by this office. This form to be followed closely and filled out in detail. The form then to be read to person in custody for him to sign and swear to. If he refuses to swear and sign to same, then agent, in presence of one witness to examination, to sign and swear to same and to have witness do the same.

"8. If a person claims American citizenship, he must produce documentary evidence of same. If native-born, through birth records. If naturalized, through producing for agent copy of naturalization papers. Be sure that these papers are final papers, containing words 'and is hereby admitted to become a citizen of the United States.'

"9. In case of any uncertainty as to citizenship or noncitizenship of persons taken into custody, or for any other reason, consult the office.

"10. Absolutely no publicity or information to be given by an agent. All such requests for information to be referred to division superintendent. Also request observance above by assisting officers."

"1. At time of apprehension, every effort must be made to establish definitely the fact that one arrested is a member of either the Communist Party of America or Communist Labor Party.

"2. It is of utmost importance to make effort to ascertain location of all

in some cases, apparently having possession of the warrants intended for service in that neighborhood; in other cases, apparently not. It is difficult from the evidence to ascertain what function, if any, was actually performed by these inspectors of the Labor Department. The arrests were in fact made by the representatives of the Department of Justice, assisted by the local police authorities, all of whom acted under the direction of the agents of the Department of Justice. The raids were made on the evening of January 2, 1920, in the following cities and towns: Boston, Chelsea, Brockton, Bridgewater, Norwood, Worcester, Springfield, Chicopee, Holyoke, Gardner, Fitchburg, Lowell, Lawrence, Haverhill, all in Massachusetts; Nashua, Manchester, Derry, Portsmouth, Claremont, Lincoln, all in New Hampshire. In some cities several halls were raided. In most communities, homes were invaded.

Kelleher says that he had operating, practically under his control, for this raid, from 300 to 500 men. This may fairly be assumed to be a moderate estimate. Most of these were agents of the Department of Justice and policemen of the various cities and towns. The plan was to make up a list of the persons intended to be arrested in a particular community; for the police and Department of Justice agents thereupon, generally without warrants, to go about to the halls or homes where these people were, arrest them, and bring them to the concentration point—commonly a police station. When halls were raided, the occupants were, as required by the instructions, lined

books and records of these organizations, and that same be secured at time of arrest.

"3. Upon making arrests, endeavor to secure admissions as to membership in Communist and Communist Labor Parties, together with any possible documentary proof.

"4. Endeavor apprehend officers of either party if aliens, searching residences for literature, membership cards, records and correspondence.

"5. Search meeting rooms and endeavor to locate charters of Communist or Communist Labor Parties, as well as membership and financial records, which, however, may be found at homes of recording and financial secretaries. Literature, books, papers and anything on the walls should be gathered up, and ceilings and partitions sounded for hiding places. Wrap anything taken and mark the location of place, names of persons obtaining evidence, and contents of each.

"6. Upon apprehension, aliens should be searched thoroughly; if found in groups in meeting rooms, line them up against the wall and there search them. Take anything which tends to establish connection with either Communist or Communist Labor Parties; in other words, only such material referring to these parties, and nothing distinctly personal, such as money and other valuables. Mark envelopes showing contents; whether found in possession of alien or in his room, with address as well as names of those obtaining evidence. Duplicate record of all this should be kept; original evidence obtained in the cases to be turned over to the immigration officers.

"7. Only aliens should be arrested; if American citizens are taken by mistake, their cases should be immediately referred to the local authorities.

"8. Arrest of members covered by warrants to be made Friday at 9 p. m. Only aliens, and connected with Communist and Communist Labor Parties; make preliminary examination as per office memorandum.

"NOTE.—These instructions are extremely confidential, are issued only for the guidance of authorized agents of this office, are charged to such agents and must be returned to this office upon completion of assignment."

up against the wall and searched. Many citizens were gathered into the net in this fashion, and brought to the various police stations. At the concentation points the sifting process went on during the night. Blanks for questionnaires had been prepared, answers to which were sought and generally obtained from the arrested persons. A copy of this questionnaire is in the margin.[3]

Assistant Superintendent West of the Boston Bureau of Investigation estimates that the total number of persons actually arrested on this raid was approximately 600. This also must be taken to be a moderate estimate. The circumstances under which the raid was carried on make it impossible for him or any other person to know with any approximate accuracy the number of persons arrested. Weighing his evidence in connection with the other testimony adduced before me, I am convinced that a much larger number of people was arrested—probably from 800 to 1,200.

Much credible evidence, as, for instance, that from the witness Liberman, bears out this estimate. Liberman testified that, at the close of a publicly advertised mass meeting held at the Finnish Hall in Mulberry street, Worcester, plain clothes agents held up the entire audience of about 200 and asked each one whether he was a citizen or not; that they held those who answered that they were not citizens, taking about 100 to the jail; later during the night all but 16 were released after being booked and answering the typical questionnaire. Steiner's and Ryder's evidence, post, points to the same conclusion.

The evidence as to the exact number of warrants then in the possession of the agents of the Department of Justice or the inspectors of

[3] Name, ...... Age, ...... Married ......
Address, ...... (street) ...... (city).
Where born? ...... (city) ...... (country) ...... date.
Arrival in U. S.? ...... (port) ...... (date) ...... (vessel).
Naturalized? ...... (place) ...... (court) ...... (date).
Declarant? ...... (place) ...... (date) ......
Where employed? ...... (company) ...... (address).
Ever arrested? ...... (where) ...... (date) ...... (cause).
Are you a member of the Communist Party? ......
If so, to what local, branch, or organization? ......
When did you become a member? ......
Have you a membership card? ......
Do you hold any office in the Communist Party? ...... Office? ......
Do you contribute financially to the support of the party? ......
Do you attend the membership meetings of the party? ......
Do you read its papers and publications? ...... If so, which? ......
Are you affiliated with any other organizations? ...... Which? ......
Were you a member of the Socialist Party? ......
Papers, correspondence, etc., found in possession of above by agent:
.................................................................................
.................................................................................
   I, the undersigned, not a citizen of the United States, on oath depose and say that I have read the above questions and answers, or have had the same read and interpreted to me, and state the same are true:
.................................................
(Signature of Alien)
Above questions and answers noted by ...............
Witness: ......

the Bureau of Labor is somewhat confusing. Apparently, however, 463 warrants had been received in Boston, dated December 29, 1919. But, assuming that this number of warrants was in Boston, over 100 of them could not have been served; for the evidence is explicit that out of the 440 persons arrested and taken to Deer Island warrants for about 100 were not at that time outstanding. For persons thus taken and held, telegraphic warrants were applied for and in most cases subsequently received. These people (100 or thereabouts) were seized on the theory that, although warrants had not then been received, there was evidence that they were alien members of the Communist or Communist Labor party, and were therefore, under the instructions, to be held and warrants thereafter obtained.

After the sifting process at the various concentration points, at which at least one-third to one-half of the total number of persons arrested were discharged after various periods of detention in cells (from a few hours to two or three days), about 440 persons were transported to Deer Island and there locked in cells. A considerable number of citizens arrested were discharged; the evidence is not clear as to whether more than one citizen was actually taken to Deer Island and there imprisoned in a cell.

The methods by which the raids were carried out may, I think, be fairly described by setting forth the substance of the evidence of Henry G. Steiner, who seemed to me to be an intelligent, accurate, and reliable witness.

Steiner is a clerk, 35 years of age, a citizen born in Manchester, N. H., and was arrested in No. 885 Washington street, Boston, on the evening of January 2, 1920, where he was in attendance at a committee meeting, there being no public meeting at that hall that night. He describes what occurred as follows:

"The committee members were not all there; so some of us sat down in one of the rear rooms to wait. We were talking, when about 9 o'clock three men came in through the back door, having guns in their hands, and about the same time the front door was thrown open and we saw some of these men there. The men in charge of the raiding party ordered those in the back room brought into the front room, and we were herded up against one side of the room with commands to hold up our hands and to get over there. We held up our hands until a preliminary search for weapons had been made. After that search had been made we were searched; I might mention this, incidentally, that while we were being herded up against the wall one of the men in the room fainted. After the preliminary search for weapons had been made we were searched for other evidence which we might have on our persons, which was placed in envelopes with our names marked on them as described by various witnesses. We were then taken down stairs and crowded into vans."

No questions were asked as to whether those arrested were American citizens. "They simply went ahead and proceeded to do these things. We were jammed into these vans and taken to Station 4. At Station 4 we were lined up in front of the desk and booked." The men who stood them up against the wall and searched them did not say whom they represented. "As I recall it, they were all in civilian clothes. I did not see a man in uniform until we got down to the street, and then we had to pass through a double row of uniformed officers." They were shown no authority whatever for their arrests. "After being booked we were taken into one of the

available rooms at Station 4 and brought out one at a time, examined by Department of Justice officers in accordance with the questionnaire that has been spoken of here."

This examination took possibly until after midnight. In the meantime others that had been apprehended at the same place were brought in, perhaps a dozen or 15, some of them American citizens. About 27 in all were taken at 885 Washington street. The witness saw no warrants of arrest anywhere that night, nor had seen any up to the time of his testimony.

Describing the later occurrences, the witness continued:

"After answering the questionnaire and signing it, which most of us agreed to do, we were taken down stairs and assigned to cells. I with ten others was assigned to one cell. I remained in that cell until the afternoon of the following day, which was Saturday, about half past 4. Four names were called out, and I was one of the four. We were taken up stairs, brought before the clerk or captain or sergeant in charge—I don't know just what he was—and we were asked as to our names. We were then handed our property. I didn't know just what that meant, so that I inquired if that meant that we were released, and I was told, 'Yes.' I went home. I didn't hear anything further from the Department of Justice until Monday night. On Monday night an inspector came to my home. * * * He came in and asked me if I was Henry G. Steiner, and I told him that I was. He said that he had received orders to come and get me and to make a search of the house. I said to him, 'I don't know who you are; have you any credentials or warrant?' He displayed his badge and said that was all the warrant he required. * * * It was a gilt badge, and I think it said 'Department of Justice' on it, as near as I could make out. He then proceeded to search; that is, he did ask me where I kept my books, literature of various kinds. I told him he would find everything right out in plain sight in the bookcase. He went to the bookcase and proceeded to search that for anything he thought he could use. He went to a table where I had books and papers of various kinds and went through them. He went up to another rack, another part of the room, and he took what he wanted from that. He pulled open several drawers, but he found they contained other than books or pamphlets, and he finally inquired if that was all I had. I said, 'You will find everything that I have got right there.'

"Q. Did he show you any search warrant? A. He did not.

"Q. Did he ask your permission to look at the property? A. He did not. In fact while I don't know as I explicitly told him not to search, but I did ask him for his credentials or search warrant, and he simply stated that the badge was all the search warrant that he required. I did not argue the matter with him further. He then took me down to the Department of Justice office——

"Q. Did he take anything with him, any of your books? A. Oh, yes; they were all wrapped up in a robe that they had in the auto, about as much as he could carry. He took me down to the Department of Justice offices. We got down there about half past 11, I should judge.

"The Court: At night?

"The witness: At night. We found that everybody had gone home except the cleaners, the porters, so that he left me there a few minutes, and he came back, and said he had found instructions that he did not require me any further that night. So that I went home. The next day they came to my place of business. He again took me to the Department of Justice. * * * The same inspector that had come to the house, came to the offices and told me that I was wanted down at Water street.

"Q. This is at your place of business? A. At my place of business. I went there, and I saw a gentleman that I think was Mr. West, and he said that some hitch had developed about my citizenship; that is, they were un-

able to verify my birth record. So I suggested that possibly they had it recorded under the wrong name; that is, they did not spell the name correctly. And he got Manchester on the long distance and found that that was correct. He then told me that he did not require me any further, and I suggested that he return to me the books and pamphlets that they had taken the previous night, which he said would be done with the exception of those papers required for evidence. A few days later all the books and pamphlets were returned, but certain papers belonging to me have been kept by them. I have never seen them since.

"Q. Is that all? A. That is all."

On cross-examination Steiner said that at No. 885 Washington street was the headquarters of the Communist Party, and he had gone there that night to attend a committee meeting that never took place; that at one time he was the business manager of the "Revolutionary Age," edited by Fraina; that the meeting he was attending that night was a defense committee meeting; that he was absolutely certain that some of the men who came in at the time of the raid had guns in their hands.

In fairness, perhaps, it should be stated that Robert M. Volkenburg, an agent of the Department of Justice called by the government, testified that he was in charge of the raid at 885 Washington street, and gave strict instructions that no guns should be drawn, and was positive that none were exhibited. Without imputing mendacity, I find Steiner's evidence the more credible.

Inspector Ryder's account of the raid in Brockton shows practically the same methods. He testifies:

That he was assigned to Brockton; that he had, "roughly, about ten" warrants; "I don't remember of identifying anybody with those warrants:" that he was in the city marshal's office.

"Q. About how many people did they bring before you for identification? A. Oh, they were being brought in all night by the police. Nearer 100 than 50, that night and the next day."

"Q. But that night you did not serve a single warrant? A. No.

"Q. Were they all released? A. No.; 18 or 19 were brought to Boston the next day. For these or most of them warrants were wired for.

"Q. And were they examined by the Department of Justice agent on the questionnaire? A. Yes, sir.

"Q. And those who answered that they were members of the Communist Party, were those the ones for whose arrest you applied for warrants? A. Well, I did not take any direct part in that examination. I knew they were examining the aliens. Once in a while I would stroll over and I might butt in and say something. I did not think I had any connection with that.

"Q. Of the men you brought to Boston for whom you applied for warrants, how many of them had answered and signed questionnaires properly? A. Oh, I believe there were questionnaires for all those who were brought in. * * *

"Q. (by the Court). Where did they pick up these people around Brockton? In the halls or in their homes? A. In their homes. I might explain that very simply. The financial secretary having been brought in with his books and membership cards of the Communist Party of America, there was found to be about 200 on his register. So that they went looking up some of those people. And the Communist card was apparently good evidence against them to apply for a warrant at least.

"Q. Well, you said they were doing it all night and a part of the next day? A. Yes, sir; the police.

"Q. Did they take these people out of bed and bring them to the police station during the night? A. Why, there was a group of police officials assigned to assist the Department of Justice, and they knew the territory and they were sent out.

"Q. Well, that went on in the evening and all through the late hours of the morning? A. Yes; your honor.

"Q. You stayed there at the station to see if you could fit any of these people to the warrants you had? A. Yes, sir.

"Q. And you did not find a single fit in your case? A. No; I was up stairs and they were brought in and detained down stairs, and a great many would be brought in without my knowledge.

"Q. What did they do with them? Locked them up? A. After a few moments; then each one would be brought up stairs and questioned and let go in many cases.

"Q. In other cases what did they do? A. Held them there.

"Q. Locked them up? A. Yes, your honor.

"Q. About how many did they take and lock up in that fashion? A. Well, not many more than the 18 or 19 that came to Boston.

"Q. Well, does that mean 25 or 30 in all, do you think? A. I don't believe there were over 25 locked up.

"Q. Did you have any search warrants down there? A. Not to my knowledge.

"Q. Well, you were in a position where you would have heard of it, if any application had been made for search warrants? A. I think so. I would have heard of it.

"Q. And they went into these homes, took the literature, and whatever they could find that they thought might be evidence, and brought that with the alien to the police station? A. Yes, your honor; the police.

"Q. Well, how many of the Department of Justice agents were down there? A. Two. But they were working about all night in the station. They were interrogating these men.

"Q. You sent the police out to get them and bring them in? A. Yes, your honor."

I refrain from any extended comment on the lawlessness of these proceedings by our supposedly law-enforcing officials. The documents and acts speak for themselves. It may, however, fitly be observed that a mob is a mob, whether made up of government officials acting under instructions from the Department of Justice, or of criminals, loafers, and the vicious classes.

Necessarily a raid of this kind, carried out with such disregard of law and of properly verified facts, had many unexpected and some unintended results. For instance, in a hall in Lynn 39 people were holding a meeting to discuss the formation of a co-operative bakery. About half of them were citizens. But the Lynn police, acting under the instructions of the Department of Justice, raided this hall and arrested the entire 39, held them over night in cells at the police station, and then had them docketed as "suspects" and 38 of them discharged.

There were also incidents of the arrests of women under conditions involving great hardship. For instance, the witness Mrs. Stanislas Vasiliewska, the mother of three children, aged 13, 10, and 8, was arrested in a hall in Chelsea, taken in the police patrol wagon with her eldest girl to the police station, and both put with another woman into one cell. About midnight they took her child and sent her home alone to a remote part of the city. Mrs. Vasiliewska was

taken the next day to the wharf, where, with Mrs. Colyer, she was confined for about 6 hours in a dirty toilet room. She was then taken to Deer Island, where she was kept 33 days. Such treatment of women by the Department of Justice contrasts with that contemplated by rule 22, subd. 10, supra, when women are taken by the Department of Labor, which has a lawful right to arrest alien women.

The witness Minnie Federman was arrested at her home at 6 o'clock in the morning. Several men, showing her no warrant, entered her room where she was in bed. She was told to get out of bed and dress, which she did in a closet. Then she was taken in a police wagon to the police station after they had searched her premises, apparently for I. W. W. literature. When they found that she was a naturalized citizen, she was allowed to go.

In Nashua a hall was raided and about 13 women taken, 6 or 7 of whom were released at the police station; 5 of them were kept from Friday night to Saturday afternoon in one cell, without a mattress.

It was under such terrorizing conditions as these that these aliens were subjected to questionnaires, subsequently used as, and generally constituting an important part of, the evidence adduced against them before the immigration inspectors. Pains were taken to give spectacular publicity to the raid, and to make it appear that there was great and imminent public danger, against which these activities of the Department of Justice were directed. The arrested aliens, in most instances perfectly quiet and harmless working people, many of them not long ago Russian peasants, were handcuffed in pairs, and then, for the purposes of transfer on trains and through the streets of Boston, chained together. The Northern New Hampshire contingent were first concentrated in jail at Concord and then brought to Boston in a special car, thus handcuffed and chained together. On detraining at the North Station, the handcuffed and chained aliens were exposed to newspaper photographers and again thus exposed at the wharf where they took the boat for Deer Island. The Department of Justice agents in charge of the arrested aliens appear to have taken pains to have them thus exposed to public photographing.

Private rooms were searched in omnibus fashion; trunks, bureaus, suit cases, and boxes broken open; books and papers seized. I doubt whether a single search warrant was obtained or applied for. There is some hearsay or inferential evidence as to obtaining so-called "gun warrants" in Worcester and Lawrence. At the trial the court stated that, if such warrants had been issued, a certified copy of the records should be produced. No such record evidence was produced. I therefore doubt the truth of this inferential evidence. But, if it was true, these "gun warrants" were obtained by an abuse of process— most likely by the use of knowingly false affidavits. "Gun warrants" could not be legally obtained or used for the purpose of searching for and seizing documentary evidence.

It is of some significance that Congress has never armed the Department of Justice with broad powers for the use of search warrants. The only search warrant statute of present significance

is found in Espionage Act June 15, 1917, tit. 11 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 10496¼a–10496¼v). This statute carefully and specifically limits, as our Constitution requires, the use of search warrants. On the doctrine of "inclusio unius exclusio alterius," it prohibits the use of search warrants in cases like the present.

[10] At Deer Island the conditions were unfit and chaotic. No adequate preparations had been made to receive and care for so large a number of people. · Some of the steam pipes were burst or disconnected. The place was cold; the weather was severe. The cells were not properly equipped with sanitary appliances. There was no adequate number of guards or officials to take a census of and properly care for so many. For several days the arrested aliens were held practically incommunicado. There was dire confusion of authority as between the immigration forces and the Department of Justice forces, and the city officials who had charge of the prison. Most of this confusion and the resultant hardship to the arrested aliens was probably unintentional; it is now material only as it bears upon the question of due process of law, shortly to be discussed. Undoubtedly it did have some additional terrorizing effect upon the aliens. Inevitably the atmosphere of lawless disregard of the rights and feelings of these aliens as human beings affected, consciously or unconsciously, the inspectors who shortly began at Deer Island the hearings, the basis of the records involving the determination of their right to remain in this country.

In the early days at Deer Island one alien committed suicide by throwing himself from the fifth floor and dashing his brains out in the corridor below in the presence of other horrified aliens. One was committed as insane; others were driven nearly, if not quite, to the verge of insanity.

After many days of confusion, the aliens themselves, under the leadership of one or two of the most intelligent and most conversant with English, constituted a committee, and represented to Assistant Commissioner Sullivan that, if given an opportunity, they would themselves clean up the quarters and arrange for the orderly service of food and the distribution of mail. This offer was wisely accepted, and thereupon the prisoners created a government of their own, called, ironically, I suppose, "The Soviet Republic of Deer Island." Through the assistance of this so-called Soviet government, conditions orderly, tolerable, not inhumane, were created after perhaps 10 days or 2 weeks of filth, confusion, and unnecessary suffering. It is not without significance that these aliens, thus arrested under charges of conspiracy to overthrow our government by force and violence, were, while under arrest, many of them illegally, found to be capable of organizing amongst themselves, with the consent of and in amicable co-operation with their keepers, an effective and democratic form of local government.

## Were the Hearings Fair or Unfair?

By the methods thus briefly described, the Department of Justice had gathered at Deer Island, nominally in the custody of the De-

partment of Labor, some 440 aliens. In order to carry out the plan of wholesale deportation, it was then necessary that these aliens be given hearings before inspectors of the Labor Department. It was recognized that legal hearings could not be conducted, in form at any rate, by agents of the Department of Justice. Burke's long letter of December 29, 1919, to Kelleher, expressly enjoined the agent of the Department of Justice that—

"At the hearings before the immigration inspector you will render all reasonable assistance to the immigration authorities both in the way of offering your services to them and the services of any of your stenographic forces."

This was construed as requiring the Department of Justice agents to be present at the hearings of the aliens before the immigration inspector, practically in many instances undertaking to participate or even give direction to those hearings. These Department of Justice agents were particularly active in producing and putting before the trial tribunal documents and publications claimed to have been obtained under such circumstances as to be evidence against the particular alien. Many of the records show that, after the hearings were practically closed, the Department of Justice agents were given opportunity to present further evidence and to express their opinions as to the conclusion that ought to be reached by the trial inspector.

[11] In dealing with these hearings, it is necessary to consider with care the extraordinary circumstances surrounding the change of rule 22, subd. 5 (b), as quoted above. Just prior to the initiation of this raid, this rule read:

"At the beginning of the hearing under the warrant of arrest the alien shall be allowed to inspect the warrant of arrest and all the evidence on which it was issued, and shall be apprised that he may be represented by counsel."

Under date of December 31, 1919, Commissioner General Caminetti, two days after the date of his confidential letter of instructions to the Boston Commissioner of Immigration setting forth the plan of the proposed raid, issued a circular letter modifying this rule. The pertinent part of this circular letter is as follows:

"December 31, 1919.

"Commissioner of Immigration and Inspectors in Charge: By direction of the *Acting* Secretary, paragraph (b) of subdivision 5, rule 22, Immigration Rules, is hereby amended, effective immediately, to read as follows:

" 'Preferably at the beginning of the hearing under the warrant of arrest or *at any rate as soon as such hearing has proceeded sufficiently in the development of the facts to protect the Government's interests,* the alien shall be allowed to inspect the warrant of arrest and all the evidence on which it was issued and shall be apprised that *thereafter* he may be represented by counsel.' "

The practical result of this changed rule, it is to be observed, was to cut the alien off from any representation by counsel, until the inspector, co-operating with or advised by the agent of the Department of Justice, was of the opinion that the hearing had proceeded "sufficiently in the development of the facts to protect the government's interests." This left these aliens, many of them uneducated and seri-

ously hampered by their inability to understand English, or even the interpreters, many of whom were but meagerly equipped with knowledge of the language and dialects used by these aliens, entirely unprotected from the zealous attempts of the Department of Justice agents to get from them some sort of apparent admission of membership in the Communist or Communist Labor Party. It should not be overlooked that many of these aliens were arrested in boarding houses or halls in which were found large quantities of literature and pamphlets, the origin and ownership of which were necessarily largely matters of guesswork. In cases of doubt, aliens, already frightened by the terroristic methods of their arrest and detention, were, in the absence of counsel, easily led into some kind of admission as to their ownership or knowledge of communistic or so-called seditious literature.

The picture of a non-English-speaking Russian peasant arrested under circumstances such as described above, held for days in jail, then for weeks in the city prison at Deer Island, and then summoned for a so-called "trial" before an inspector, assisted by the Department of Justice agent under stringent instructions emanating from the Department of Justice in Washington to make every possible effort to obtain evidence of the alien's membership in one of the proscribed parties, is not a picture of a sober, dispassionate, "due process of law" attempt to ascertain and report the true facts.

The modification of the rule, by the authority of the Acting Secretary of Labor, continued in force about a month, during which substantially all the hearings at Deer Island were practically completed. But on January 28, 1920, the Secretary of Labor, who is stated to have been absent because of illness on December 31, 1919, when the change in the rule was made cutting off the right of the alien to have any real assistance from counsel, by telegram (copy below) ordered the old rule restored:

"Jan. 28.

"Immigration Service, Boston, Mass.: By direction of secretary paragraph B subdivision five rule twenty-two restored to form in which it existed previous to amendment December thirtieth nineteen nineteen. In other words amendment of December thirtieth nineteen nineteen should be disregarded from and after receipt this telegram. Abercrombie."

This amendment shows the clear purpose of the Secretary of Labor to have these aliens properly treated, guarding their constitutional rights and insuring the Secretary, as the final tribunal, in having before him, as the basis for the discharge of his important duties, records representing at least a fair, dispassionate, and intelligent attempt to ascertain and report the facts of controlling importance. But it must not be overlooked that this restoration of the old rule came too late to protect the rights of the petitioners in these cases. They had already been tried.

It is difficult to conceive a case in which the right of aliens to be represented by counsel could be more vital. These particular aliens were charged with affiliation with political or economic or-

ganizations with the purposes of which most of them had little or no comprehension. As pointed out hereafter, the Communist and the Communist Labor Parties were the result of an internal row or split in the old Socialist Party, and many of the members of the Communist Party and the Communist Labor Party became such automatically. In the minds of many of them there was no change but in name. They supposed they had joined an organization or a political movement which to them represented, dimly and obscurely, sympathy with the forces in Russia that had overthrown the tyranny of the Czar from which many of them had sought escape by emigrating to the United States. Deliberately to plan to cut these aliens off from the advice and assistance of counsel until they were involved in apparent admissions that they were members of or affiliated with an organization teaching the overthrow of this government by force and violence, the practical equivalent of a charge of treason if against citizens, is utterly inconsistent with every notion involved in the conception of "due process of law."

I hear from the government no convincing answer to Mr. Frankfurter's proposition that these petitioners had a right to the—

"protection that rule 22 afforded them as it stood before the ad hoc repeal of that rule for the purpose of these cases. Now, if there is one thing that is established in the law of administration, I take it that it is that a rule cannot be repealed specifically to affect a case under consideration by the administrative authorities; that is, if there is an existing rule which protects certain rights, it violates every sense of decency, which is the very heart of due process, to repeal that protection, just for the purpose of accomplishing the ends of the case which come before the administrative authority. * * * And there was a sudden, calculated, and surreptitious deprivation of that safeguard which was sought to protect the rights of all, and particularly protect those who were innocent."

As the hearings before the immigration inspectors progressed, it became evident that the preliminary investigations made before arrests, not, as contemplated by the rules of the Department of Labor, by the experienced inspectors of that Department, but by agents of the Bureau of Investigation of the Department of Justice, were wholly inadequate and unreliable.

Although, as set forth above, the number of persons actually arrested was probably two or three times the number taken to Deer Island (about 440), against the majority of these thus detained the immigration inspectors found no evidence warranting detention. They were therefore constrained to recommend the cancellation of the warrants or that the aliens be discharged on their own recognizance, a proceeding which the statutes and rules do not appear to contemplate, but which seems, on the basis of practical justice, to have been adopted and used in the Department of Labor. The testimony of Inspector Ryder as to his experience may be taken as fairly illustrative of the conditions found: On April 8, 1920, he testified that he had heard at Deer Island 75 cases and had then disposed of between 30 and 35; that of these 35 cases he estimated that in 25 he had recommended a cancellation of warrants; that he had recommended

deportation in only 4 to 7 cases out of the 30 to 35 disposed of; also that he had recommended release on their own recognizance in from 30 to 40 cases, including most of the women; that these recommendations were made after a preliminary hearing, generally with an agent of the Department of Justice present.

The manifest result of this lack of evidence adequate on the government's own theory to hold these aliens for deportation was to discredit the activities of the Department of Justice that had promoted this spectacular raid and furnished to Acting Secretary of Labor Abercrombie the evidence upon which the hundreds of warrants used in this district had been issued by him. Accordingly, as the necessity for discharging the great majority of those arrested became increasingly obvious, the pressure to make a record adequate to hold those against whom any evidence whatever could be found increased. As discharges increased, the chances of discharge of the aliens within the realm of reasonable doubt decreased. As the number of aliens available for deportation decreased, pressure upon the trial tribunals to resolve all doubts against those who remained would naturally increase.

I note again that with the inspector at the hearing was an agent of the Department of Justice that had initiated and carried on this great raid, and that the alien had no counsel to represent him until the hearing was practically closed. Under such circumstances, it is not to my mind conceivable that these immigration inspectors could do justice to these ignorant, non-English-speaking, bewildered aliens.

It is not necessary to attack the purposes or character of the immigration inspectors. I would say of them nothing unjust or harsh. They were in a most uncomfortable position. Weighing fairly the conditions, perhaps they could not be expected adequately to resist the pressure put upon them to find evidence of membership in the Communist Party when there was no real evidence. At any rate, after a careful consideration of their testimony and of the records they made, in the light of their appearance before me, I am satisfied that they did not extend to a large share of the aliens a fair and impartial trial. The conditions under which these aliens were tried for their right to live in America were, in my view, inconsistent with due process of law conditions.

In order properly to weigh the evidence concerning the status of these alleged Communists, it is necessary also to sketch the origin and general relations of the Communist and Communist Labor Parties to the old Socialist Party.

These two organizations, proscribed by the Department of Justice, are the result of a factional split or row in the summer of 1919 in the old Socialist Party. In the spring of 1919 the Socialist Party is alleged to have had a membership of approximately 100,000; membership meaning those who pay dues, not those who vote the Socialist ticket, generally many more in number. Both the Socialist Party and its offshoots and fragments, the Communist and Communist Labor Parties, are constituted somewhat like a ramifying fraternal or

lodge organization, with a central controlling body consisting of delegates, and locals existing in various cities and towns scattered, although rather sparsely, throughout the country.

In the spring of 1919 the Socialist Party divided into Left Wing Socialists and Right Wing Socialists. The Right Wing Socialists, though, as the event proved, less in number, seem to have gotten possession of the party machinery. · At any rate, they expelled wholesale most of the locals situated in this section of the country. In other sections, the Left Wing seceded, naturally under the guidance of the officials and other leaders. As the result of this disruption, perhaps 50,000 of the Socialists took the name of Communists; perhaps 25,000 remained Socialists and in the control of the old name and party machinery. Of the balance of 25,000, perhaps half formed the Communist 'Labor Party, and the other half dissolved ·or went into still smaller differing and discordant groups.

The reason for this civil war and disruption · do not very clearly appear in the evidence and documents before me. If apparent, they would probably have little bearing upon the issues here. But it is material and important, when considering the status and rights of many of the less intelligent, particularly the non-English-speaking alleged members of the Communist Party, to have in mind that, especially in New England, the controversy resulted· in the wholesale expulsion from the Socialist Party of these New England locals, and the practically automatic adoption by these locals of the name Communist and the new Program. The result was that the rank and file of the less educated membership knew little or nothing about the controversy, or the nature and extent of the change, if any, in the Program and principles of the party. Some of them regarded it simply as a change of name; others knew there was some sort of little understood change in Program and purpose. But the great mass of the former Socialists who had thus become alleged Communists had no real comprehension of any important or material change either in their associations or in the political or economic purposes sought to be achieved by their negligibly weak organizations. Social, educational purposes, and race sympathy, rather than political agitation, constituted the controlling motives with a large share of them. They joined the local Russian or Polish or Lithuanian Socialist or Communist Club, just as citizens join neighborhood clubs, social or religious, or civic, or fraternal.

The Russians appear to have regarded the Bolshevists as the successful revolutionists in their native land, who had overthrown the brutal tyranny of the Czars, from which they had fled, and for which they cherished a sincere ·and well-warranted hatred. For instance, the witness Sidor Serachuk, through an interpreter, testified that he had never heard of the Nihilists, but that he did know about the fight against the Czars:

"I know that for years during the reign of the Czar we had to work for 15 kopecs a day, and they drove us with whips.

"Q. (by the Court). Drove them to work, he means? A. Well, it means that we have to work for 15 kopecs a day, as we had to live.

"Q. Does he mean literally that they drove them with whips, or is that a metaphorical, or rhetorical, or revolutionary phrase? A. 'Yes, literally so, with whips,' replied the interpreter, after asking the witness."

This witness had left a country in which he was driven to work "with whips" at 7½ cents a day. He was earning, when arrested, 45 cents an hour; he naturally had no notion of overthrowing the government under which he was then living.

### The Issues Presented.

Notwithstanding its length, the foregoing covers none too adequately the facts that must be considered in order to determine the issues involved. I come now to deal with the chief contentions of the petitioners:

[12] 1. As above stated, counsel for the aliens ask me to hold the whole proceeding void, ab initio, because initiated and conducted by the Department of Justice, and not by the Department of Labor, to which the statute has delegated the power and duty of investigating and deporting aliens of the proscribed classes. The contention is that the deportation warrants, although signed and issued by the Acting Secretary of Labor, are void, because grounded on investigations and proceedings not authorized by the statute. I am unable to support this proposition. It is plausible, but I think not sound. It goes too far. While, as stated above, the Department of Justice has no more legal right and power to deal with the immigration and deportation of aliens than has the Department of the Interior, or any other department, it does not follow that the Department of Labor may not, if it chooses, avail itself of investigations made and evidence obtained by the agents of the Department of Justice or of any other government department, or even by nonofficial volunteers. Preliminary investigation by its own inspectors cannot, I think, be held a legal condition precedent to the issuance of a warrant for the arrest and for the subsequent hearing of the alien. Wholesale assumption, as in this case, of the important duty of preliminary investigation, by the agents of another department, who do the work very badly and produce results very unreliable, may go far to deprive the hearings before the inspectors of the essential characteristics of due process of law, and may thus invalidate the warrants of deportation based thereon. The whole undertaking is brought under just suspicion. But such invalidity does not, I think and rule, arise strictly as matter of law from the method by which these proceedings originated in the Department of Justice. I am therefore constrained to hold, in spite of their suspicious genesis, that the warrants of deportation now before the court may have legal validity, notwithstanding the fact that all the preliminary investigations and arrests were really made by the Department of Justice and not by the Department of Labor. It is enough now to rule that they are not plainly void ab initio.

2. A second contention—which, if sustained, disposes of all the cases—is that the Secretary of Labor is wrong in holding the Com-

munist Party a force and violence party within the purview of the act of October 16, 1918, and that this court has, on habeas corpus proceedings, jurisdiction to reverse the secretary's decision. This amounts to saying, either that the Secretary's holding is wrong in point of law in the construction or application of the statute, or that there is no evidence before him that the Communist Party is a force and violence party. Of course no contention can be or is made that the court may reverse the immigration authorities on pure questions of fact.

[13] The questions involved in this fundamentally important contention I regard as not entirely free from doubt. I regret that it is necessary for this court to rule on these questions. If, under the federal statutes, the District Court could reserve or report these questions for the court above—as a trial judge sitting in equity may, under the Massachusetts statutes, reserve and report a case to the full court—I should thus dispose of this part of the present problem. But I have no power to reserve or report. A ruling one way or the other is a condition precedent to a final judgment, grounding the right to one side or the other by appeal to take the case to the Supreme Court or to the Court of Appeals, where the real decision must obviously be made. The case cannot be taken up in fragments. Oneida Co. v. Job Co., Inc., 252 U. S. —, 40 Sup. Ct. 357, 64 L. Ed. —, decided April 19, 1920; Collins v. Miller, 252 U. S. 364, 40 Sup. Ct. 347, 64 L. Ed. —, decided March 29, 1920.

As pointed out below, the cases of some of the aliens may be disposed of without questioning the soundness of the Secretary's ruling as to the obnoxious character of the Communist Party, because the records upon which the Secretary grounded his holdings adverse to these aliens are vitiated by lack of due process. But in other cases—of the Colyers, Mack, and Bondar—the issue of the validity of the Secretary's rulings is probably squarely presented, reserving, however, for later comment the questions as to whether the Platform and Manifesto on which the Secretary based his adverse ruling may not be under just suspicion of being in part a product of the government's "under-cover informants" or pretended members of the Communist Party.

[14] Do the authorities sustain the contention of the petitioners that the court on this habeas corpus proceeding may go behind the Secretary's ruling, and, if so, determine it to be wrong?

The case which lends most support to this contention is Gegiow v. Uhl, 239 U. S. 3, 36 Sup. Ct. 2, 60 L. Ed. 114, a unanimous decision by the Supreme Court of the United States in 1915, opinion written by Mr. Justice Holmes. The immigration authorities excluded Russian immigrants on the ground that they were—

"liable to become public charges for the following, among other reasons: That they arrived here with very little money ($40 and $25, respectively), and are bound for Portland, Or., where the reports of industrial conditions show that it would be impossible for these aliens to obtain employment; that they have no one legally obligated here to assist them, and upon all the facts the said aliens were upon the said grounds duly excluded."

The court said:

"We assume the report to be candid, and, if so, it shows that the only ground for the order was the state of the labor market at Portland at that time; the amount of money possessed and ignorance of our language being thrown in only as makeweights. It is true that the return says for that 'among other reasons.' But the state of the labor market is the only one disclosed in the evidence or the facts that were noticed at the hearing, and the only one that was before the Secretary of Labor on appeal; and as the order was general for a group of 20 it cannot fairly be interpreted to stand upon reasons undisclosed. Therefore it is unnecessary to consider whether to have the reasons disclosed is one of the alien's rights. *The only matter that we have to deal with is the construction of the statute with reference to the present case.*

"*The courts are not forbidden by the statute to consider whether the reasons, when they are given, agree with the requirements of the act. The statute, by enumerating the conditions upon which the allowance to land may be denied, prohibits the denial in other cases. And when the record shows that a commissioner of immigration is exceeding his power, the alien may demand his release upon habeas corpus. The conclusiveness of the decisions of immigration officers under section 25 is conclusive upon matters of fact.* This was implied in Nishimura Ekiu v. United States, 142 U. S. 651, relied on by the government. As was said in Gonzales v. Williams, 192 U. S. 1, 15, 'As Gonzales did not come within the act of 1891, the commissioner had no jurisdiction to detain and deport her by deciding the mere question of law to the contrary.' *Such a case stands no better than a decision without a fair hearing, which has been held to be bad.* Chin Yow v. United States, 208 U. S. 8. See further Zakonaite v. Wolf, 226 U. S. 272; Lewis v. Frick, 233 U. S. 291, 297. * * *

"The statute deals with admission to the United States, not to Portland, and section 40 contemplates a distribution of immigrants after they arrive. It would be an amazing claim of power if commissioners decided not to admit aliens because the labor market of the United States was overstocked."

(Italics mine.)

This decision is a flat holding that questions of law involving the construction of the act are reviewable by the courts. This decision has the more significance in that it overruled both the Court of Appeals and the District Court below.

Gonzales v. Williams, 192 U. S. 1, 15, 24 Sup. Ct. 171, 48 L. Ed. 317, involved a question of law as to whether citizens of Porto Rico were aliens within the meaning of the immigration statutes, and this was held within the court's jurisdiction.

Compare Commonwealth v. Sullivan, 146 Mass. 142, 15 N. E. 491.

[15] The decision in American School of Magnetic Healing v. McAnnulty, 187 U. S. 94, 23 Sup. Ct. 33, 47 L. Ed. 90, rests on the principle that decisions of administrative officials to be valid must have some competent evidence to support them.

That case involved the validity of a "fraud order" made by the Postmaster General against the plaintiff's mail. The order operated, of course, as a destruction of the plaintiff's business. The plaintiff alleged in effect that its business methods were grounded "almost exclusively on the physical and practical proposition that the mind of the human race is largely responsible for its ills, and is a perceptible factor of treating, curing, benefiting, and remedying thereof," and, after more to the same effect, asserted as a conclusion that its

business was not a fraud, and that therefore the acts of the Post-master General were invalid.

The court below sustained a demurrer and dismissed the bill. This decision was reversed by the Supreme Court, which held the government might show at the trial, if it could, that the business of the plaintiff, as in fact conducted, amounted to a violation of the statutes. This decision clearly is to the effect that questions of law are for courts, and that it is a question of law whether there is any evidence to support an administrative, mandate. This principle is obviously nothing but the familiar doctrine, arising in personal injury cases, to the effect that it is a question of law for the court as to whether there is any evidence of negligence or of due care.

Compare Mylius v. Uhl, 210 Fed. 860, 127 C. C. A. 422; Mylius v. Uhl (D. C.) 203 Fed. 152.

The immigration authorities ordered Mylius to be deported on the ground that he had been convicted of a "crime involving moral turpitude," a legal basis for deportation. He had been convicted of criminal libel against the king of England by charging the king with having put away his lawful wife in order to marry a woman of royal blood. The Court of Appeals for the Second Circuit, affirming a like decision in the District Court, held this question reviewable on habeas corpus, and reversed the immigration authorities, holding this crime not to involve moral turpitude.

It therefore follows that the construction of the statute, the applicability of the statute to the particular case, and the question whether or not the reasons given by the Secretary of Labor for the deportation agree with the requirements of the act are questions of law which are reviewable by the courts.

See, also, Turner v. Williams, 194 U. S. 279, 24 Sup. Ct. 719, 48 L. Ed. 979; Whitfield v. Hanges, 222 Fed. 745, 138 C. C. A. 199.

In support of the contrary rule, to the effect that the decision of the Department of Labor is final, are cited such decisions as United States v. Ju Toy, 198 U. S. 253, 262, 25 Sup. Ct. 644, 646 (49 L. Ed. 1040), in which Mr. Justice Holmes stated:

"It is established, as we have said, that the act purports to make the decision of the department final, whatever the ground on which right to enter the country is claimed, as well when it is citizenship as when it is domicil and the belonging to a class excepted from the exclusion acts"—citing United States v. Sing Tuck, 194 U. S. 161, 167, 24 Sup. Ct. 621, 48 L. Ed. 917; Lem Moon Sing v. United States, 158 U. S. 538, 546, 547, 15 Sup. Ct. 967, 39 L. Ed. 1082.

In Chin Yow v. United States, 208 U. S. 813, 28 Sup. Ct. 201, 203 (52 L. Ed. 369), Mr. Justice Holmes ends an opinion, sustaining a petition for the writ, with this admonition:

"But unless and until it is proved to the satisfaction of the judge that a hearing properly so called was denied, the merits of the case are not open, and, we may add, the denial of a hearing cannot be established by proving that the decision was wrong."

If the Ju Toy and Chin Yow Cases were inconsistent with the Gegiow Case, the last decision would of course be controlling. I

hold, however, that these cases are not inconsistent. The Ju Toy and Chin Yow Cases, so far as applicable here, merely hold that the decision of the Secretary of Labor is final on questions of fact. They do not hold that his decisions on questions of law are final or are not reviewable by the courts.

The petitioners also argue that the Secretary of Labor grounded his decision in the Preis Case (set forth in the margin)[4] entirely upon

[4] Opinion of Secretary Wilson in Preis Case.

"Age, 31; native of Austria; entered the United States at Port Huron, Mich., on November 13, 1915, having arrived in Quebec by steamship Scotan June 14, 1914. This is a case arising under the provisions of the act of October 16, 1918.

"It is alleged that the alien is a member of the Communist Party of America, which is affiliated with the Communist International. The alien admits membership in the Communist Party of America, and that is affiliated with the Communist International. The sole question, therefore, to be determined by the Secretary of Labor is: Is the Communist Party of America such an organization as is described in the act of October 16, 1918, membership in which makes an alien liable to deportation? The language of the act applicable to this particular case is as follows:

"'Section 1. * * * Aliens who are members of or affiliated with any organization that entertains a belief in, teaches, or advocates the overthrow by force or violence of the government of the United States.

"'Sec. 2. * * * shall, upon the warrant of the Secretary of Labor, be taken into custody and deported in the manner provided in the Immigration Act of February 5, 1917.'

"It will be observed that belief in, teaching, or advocating the overthrow of the government of the United States is not alone sufficient to bring any organization within the scope of the act. There must, in addition, be a belief in, teaching, or advocacy of force or violence to accomplish the purpose. Bearing that in mind, we may proceed to an examination of the facts.

"The Manifesto and Program and constitution of the Communist Party of America and the Manifesto of the Communist International are submitted in evidence and their authenticity admitted. The constitution of the Communist Party (see page 19 of the Manifesto) requires that:

"'Sec. 2. Applicants for membership shall sign an application card reading as follows: "The undersigned, after having read the constitution and Program of the Communist Party, declares his adherence to the principles and tactics of the Party and the Communist International, agrees to submit to the discipline of the party as stated in its constitution, and pledges himself to engage actively in its work."'

"An examination of the documents submitted clearly demonstrates the fact that it is the purpose of the Communist Party to overthrow the government of the United States. There are many statements that might be quoted showing that purpose. The two following are typical. On page 9 of the Manifesto and Program the statement is made:

"'Communism does not propose to "capture" the bourgeoise the parliamentary state, but to conquer and destroy it.'

"And again, on the same page:

"'The proletarian class struggle is essentially a political struggle. * * * The objective is the conquest by the proletariat of the power of the state.'

"Many other statements of similar purport are to be found in the same document. After having found that it is the purpose of the Communist Party to conquer and destroy the government of the United States, the next point of inquiry is as to how the conquest is to take place.

"It is apparent that the Communist Party does not seek to attain its objec-

his construction of the Communist documents, that the construction of written documents is a question of law for the court, and that the Secretary erred in that construction. They rely on the principle laid down in cases like Hamilton v. Insurance Co., 136 U. S. 242, 255, 10 Sup. Ct. 945, 34 L. Ed. 419, and Smith v. Faulkner, 12 Gray (Mass.) 251.

This contention is plausible. Possibly it is sound. But it seems to me a narrow and unsatisfactory basis for a court review of the Secretary's decision. It is not entirely clear that the Secretary had nothing before him except the Communist documents. If he had, he sat as jury, not as court. Even if he did not, his function seems to be that of drawing inferences of fact from these documents. The problem with which he dealt was to determine the beliefs, the plans, and prospective actions of a large number of people organized into a so-called political party. This seems to be a question of fact. At any rate, I find it unnecessary for this court to base a conclusion that the

tive through the parliamentary machinery of this government, established by and operated under the Constitution. That is made sufficiently clear by the following excerpt from page 15 of the Manifesto referred to:

" '(b) Participation in parliamentary campaigns, which in the general struggle of the proletariat is of secondary importance, is for the purpose of revolutionary propaganda only.'

"And again from pages 9 and 10 of the same document:

" 'In those countries where the conditions for a workers' revolution are not yet ripe, the same process will go on. The use of parliamentarism, however, is only of secondary importance.'

"And further, on page 10:

" 'The parliamentarism of the Communist Party performs a service in mobilizing the proletariat against capitalism, emphasizing the political character of the class struggle.'

"The parliamentary processes established by our government are to be discarded or used for propaganda purposes only and other means adopted for overthrowing the government of the United States. These means are stated at considerable length and frequently reiterated, seemingly for purposes of emphasis. The conquest of the power of the state is to be accomplished by the mass power of the proletariat.

"Strikers are to be broadened and deepened, making them general and militant, and efforts made to develop their revolutionary implications. The strike is to be used, not simply as a means to secure redress of economic wrongs, but as a means through which the government may be conquered and destroyed. A few excerpts from the Communist Party and Communist International Manifestoes will make these statements evident.

"Thus on page 10 of the Manifesto and Program of the Communist Party of America is the following:

" 'The conquest of the power of the state. is accomplished by ,the mass power of the proletariat. Political mass strikes are a vital factor in developing this mass power, preparing the working class for the conquest of capitalism. The power of the proletariat lies fundamentally in its control of the industrial process. The mobilizing of this control against capitalism means the initial form of the revolutionary mass action that will conquer the power of the state.'

"And again, on page 11 of the same document:

" 'Mass action is industrial in its origin, but it acquires political character as it develops fuller forms. Mass action, in the form of general political strikes and demonstrations, unites the energy and forces of the proletariat, brings proletarian mass pressure upon the bourgeois state. The more general and

Secretary's decision is subject to the court's review upon the narrow ground that his construction of the written instruments raised a pure question of law.

But I am constrained by the decisions to hold it the duty of the court to consider whether the construction of the statute adopted by the Secretary of Labor is the fair and reasonable construction thereof, and also whether there was before him any real evidence to support the finding of fact which he must have made in order to warrant the deportation of these aliens.

The problem falls into two parts:

(1) What did Congress mean by the words "force," "violence," and "overthrow" as used in this statute?

(2) Was there before the Secretary of Labor any real evidence upon which he might have found that the Communist Party believed in or advocated "the overthrow of the government of the United States by force or violence"?

conscious mass action becomes, the more it antagonizes the bourgeois state, the more it becomes political mass action. Mass action is responsive to life itself, the form of aggressive proletarian struggle under imperialism. Out of this struggle develops revoluntionary mass action, the means for the proletarian conquest of power.'

"And further, on page 12, of the same document:

" 'Strikes of protest develop into general political strikes, and then into revolutionary mass action for the conquest of the power of the state. Mass action becomes political in purpose while extra parliamentary in form; it is equally a process of revolution and the revolution itself in operation.'

"Then on page 16:

" 'The Communist Party shall participate in mass strikes, not only to achieve the immediate purposes of the strike, but to develop the revolutionary implications of the mass strike.'

"And then, making the purpose still more clear, we have the following from page 30 of the Manifesto of the Communist International, with which the Communist Party of America is affiliated, and whose Manifesto is accepted as part of the policy of the party:

" 'The revolutionary era compels the proletariat to make use of the means of battle which will concentrate its entire energies, namely, mass action, with its logical resultant, direct conflict with the governmental machinery in open combat. All other methods, such as revolutionary use of bourgeois parliamentarism, will be of only secondary significance.'

"From these quotations and numerous other statements in the Manifesto, not here quoted, it is apparent that the Communist Party of America is not merely a political party, seeking the control of affairs of state, but a revolutionary party, seeking to conquer and destroy the state, in open combat. And the only conclusion is that the Communist Party of America is an organization that believes in, teaches, and advocates the overthrow by force or violence of the government of the United States.

"It does not devolve upon the Secretary of Labor officially to determine whether Congress was wise in creating the law, or the Communist Party wise in creating the facts. It is his duty to apply the law to the facts as he finds them. It is mandatory upon him to take into custody aliens who are members of this organization and deport them in the manner provided for in the immigration act of February 5, 1917.

"Your memorandum of January 17, 1920, recommending that the department issue its warrant for the deportation of Englebrert Preis, such deportation to be to Austria, at government expense, is hereby approved.

"[Signed]    W. B. Wilson, Secretary."

The immigration authorities have no legal right to deport these aliens unless there was some evidence tending to show that the Communist Party "believes in, advocates or teaches the overthrow of the United States by force or violence" within the fair meaning of the words "overthrow," "force," and "violence" as used in this statute.

This problem may be most conveniently approached by considering, first, what the evidence shows that the Communist Party is *not,* and also what it *is.* It is not a militaristic organization. It is antimilitaristic—pacifist. The seventh item of its Program is: "The United States is developing an aggressive militarism. The Communist Party will wage the struggle against militarism as a phase of the class struggle to hasten the general fall of militarism." It does not advocate force or violence of the bombing, nihilistic, or anarchistic kind; nor sabotage, nor any other form of destruction of property. Its organization is like that of a fraternal society constituted on the lodge system, with local delegates to a central convention. It meets in halls; openly not secretly; not in armories; not in laboratories, where explosives might be compounded. Its members contribute dues of 40 cents a month, the proceeds to be divided between locals and centrals. Not much of a revolution can be financed on dues of 40 cents a month levied upon a comparatively small number of wage-earners, hitherto prolific in factional discord. Its whole scheme is for propaganda by words, not by deeds. No weapons of the cutting or exploding kind, with which modern wars, insurrections, and revolutions are carried on, were found in this raid. There is therefore not a scintilla of evidence warranting a finding that the Communists are committed to the "overthrow of the government of the United States" by violence or military force or by the use of weapons or bombs or of any other devices for destroying or injuring life or property. "Violence" is no part of their Program.

Pursuing further the negative side, it also appears that the Communists do *not* rely upon parliamentarism—the ordinary and accepted use of the ballot—as the chief means of attaining their ends. They regard parliamentarism as of only secondary importance. They exhort their members to participate in parliamentary campaigns "for the purpose of revolutionary propaganda only." They denounce the moderate Socialists as having "stultified proletariat political action by limiting it to elections and participations in legislative reform activity." In sum, they seek their ends neither by bullets, bayonets or bombs, nor by ballots.

But their nonreliance upon parliamentarism is not enough to ground an inference that they adopt violence as an alternative. In this regard the Secretary of Labor seems to me to have fallen into error. No organized set of human beings can be found to be committed to the proposition of overturning a great government by violence unless their plan of organization admits at least the possibility of the existence of violence. The organization and the avowed purposes of the Communists exclude such possibility.

On what, then, does the Communist Party rely for effecting the radical changes in the scope and functions of the government which

it urges; changes which its own Manifesto describes as "revolutionary"? Upon creating "mass consciousness," "mass action," the concrete and effective expression of which is the general strike.

Stated as a generalization, their proposition is that under capitalistic society the mass of the workers, who are alleged to do the really productive work, are exploited and robbed by the minority; that, as a resultant of "mass consciousness" and "mass solidarity," the real workers may say to society: "We will hereafter work on our own terms or not at all." This theory is easy of statement and superficially pleasing and plausible. But, translated into practical, political action, it means nothing but advocacy of the general strike as a political weapon; otherwise, it is nothing but idle words: "Vox, et præterea nihil."

It is no proper part of the present function of this court to analyze and comment upon the gross errors, historic, economic, and logical, into which the Communists fall in their differentiation of workers from nonworkers, or to depreciate their unconstructive, impractical motions of a political and economic society managed only by those whom they now erroneously classify as "workers." The present task is merely to determine what "force" they really seek to use in order to effect the changes they urge, and thus to reach a conclusion as to whether that force is the sort of force condemned by the statute of October 16, 1918.

The conclusion is irresistible that the only force worth discussion, believed in or advocated by this party, is the general strike; otherwise, its methods are those of ordinary political and social propaganda. It is true that in the Manifesto and Platform—the chief documents before the Secretary of Labor in the Preis Case—are found, as in political platforms in general, some stock phrases concerning "the necessity of revolution" and a "conquest of the power of the state" to new and better uses. But it is notorious that political platforms generally adopt the language of exaggeration.

Both religious and political crusaders commonly use the nomenclature of warfare. Here in the Occident, freedom, and a saving sense of humor and of proportion, have, until recently, saved us from being frightened by crusaders' rhetoric. In an Oriental missionary field, "Onward, Christian Soldiers" is said to be regarded as an alien, seditious, war song, the use of which the missionaries had to abandon. Our hymn books may shortly attract the eye and excite the suspicions of the official censor.

At any rate, on fair analysis it is entirely clear that the literature of the present Communist Party is nothing but Marxian Socialism, supplemented by a little sympathetic reference to Bolshevism, and some additional stress laid upon mass solidarity and the resultant influence or force they propose to use, viz. the general strike as a political weapon.

There is little new in this program. As testified by the witness Ferguson, a highly intelligent and enthusiastic Socialist or Communist, practically all the propositions set forth in the present turgid,

rhetorical Program are found in the Manifesto of 1847 of Marx and Engels. With the chief tenets of Marxian Socialism, of course, every liberally educated student of economics and sociology has for more than two generations been familiar. There is a substantial literature concerning it found in every well-equipped public and university library. Marxian Socialism has for more than two-thirds of a century evoked the support of a set of radical thinkers and propagandists in most of the countries of Western Europe. Of recent years it has had some followers in this country. But these theories have never commanded the general assent or support of the believers in a sound and progressive democracy. Never, until this raid, were they treated seriously in England or in the United States. Whether our Anglo-Saxon institutions are or are not properly described as "capitalistic," hitherto we have had sufficient confidence in them and in their endurance, so as not to be frightened into intolerance and hysterical lawlessness by the specter of a dominating Marxian Socialism. Bismarck in Germany sought to suppress Marxian Socialism by legislation, with the usual result of promoting it.

See Hunter's "Violence and the Labor Movement," c. IX, pp. 214–228.

In 1890, after 12 years of foolish and futile endeavors to kill thinking and its expression by law, the German Anti-Socialist statute was repealed.

[16, 17] I turn, now, to deal with the statute. What is its fair interpretation? At the outset I note that it is not to be extended by construction. The traditional policy of the United States is to admit all aliens except specifically designated classes. It is for Congress, not for the Department of Labor, the Department of Justice, or the courts, to determine this important part of our national policy towards other nations and other peoples. And statutory restrictions on immigration, like all other statutes, are, if possible, to be construed in accordance with the spirit as well as within the letter of our Constitution, including the First Amendment and its declaration for freedom of speech, press, and assemblage.

Nor should it be overlooked that the words "overthrow the government of the United States by force or violence" are found in a context which indicates that Congress had in mind military insurrections of the ordinary kind, and bombing and assassination attacks on the government. The section in full is as follows:

"That aliens who are anarchists; aliens who believe in or advocate the overthrow by force or violence of the government of the United States or of all forms of law; aliens who disbelieve in or are opposed to all organized government; aliens who advocate or teach the assassination of public officials; aliens who advocate or teach the unlawful destruction of property; aliens who are members of or affiliated with any organization that entertains a belief in, teaches, or advocates the overthrow by force or violence of the government of the United States or of all forms of law, or that entertains or teaches disbelief in or opposition to all organized government, or that advocates the duty, necessity, or propriety of the unlawful assaulting or killing of any officer or officers, either of specific individuals or of officers generally, of the government of the United States or of any other organized government, because of

his or their official character, or that advocates or teaches the unlawful destruction of property shall be excluded from admission into the United States."

Speaking broadly, the whole section is a condemnation of alien-bombing anarchy, in all its forms and activities.

The salient words in the present case are "force or violence"; if "force" is not absolutely synonymous with "violence," it is clear that it does not mean "force" of the religious, moral, or political kind. The only remaining question is as to whether it may mean economic force, exercised through the medium of a general strike; a force analogous to the economic boycott advocated as one of the chief means of keeping peace, if and when we have a peace-keeping League of Nations.

[18] Analysis, then, brings me to this crucial question: Did Congress intend by the use of the word "force" in this statute to condemn the general strike when advocated as a political weapon by aliens? There is clearly no evidence that the Communist Party advocated the use of any other serious kind of force in their attempts to change our political institutions. I pass for the moment the question as to whether their proposed changes really amount to an "overthrow" of the government.

Now, it would be strange to find Congress dealing with the general strike in this inadequate and disguised fashion. Unquestionably, the general strike is a tremendous, almost a terrorizing, force. But it is not violence, although violence may follow as an incident of any strike, general or special. With the general strike as a political weapon, this and other nations may at some time have to deal. No intimation is made that the general strike is a proper weapon to be used in political agitation; the present question is not whether the general strike be a desirable or undesirable, a proper or an improper, force to invoke in order to obtain changes in the structure of society. The present problem is purely one of statutory construction: Did Congress, by the Act of October 16, 1918, providing for the expulsion of aliens seeking to overthrow our government by force or violence, intend thereby to outlaw the general strike, at any rate when advocated by aliens?

I am unable to believe that such was the purpose of Congress. It is not the natural interpretation of the words. It does not accord with the historic genesis of the statute. Moreover, this statute should be interpreted in the light of legislative precedents and of analogous legislation. It is familiar history that for about a century the tendency of lawmaking bodies has been to legalize and to facilitate, not to outlaw, strikes as forces in the industrial conflict. The trend of American legislation has been to limit the power of the courts to interfere with strikes by injunction.

Compare Coppage v. Kansas, 236 U. S. 1, 35 Sup. Ct. 240, 59 L. Ed. 441, L. R. A. 1915C, 960, and statutes referred to in note at 236 U. S. 27.

Sections 6, 9, and 16 of the Clayton Act of October 15, 1914 (38 Stat. 730 [Comp. St. §§ 8835f, 8602a, 8835o]), are recent legislative provisions enacted by Congress, after a long struggle, intended to make the strike a more effective weapon for labor in its struggle with capital for a larger share of the product. Congress has this past winter refused to make railroad strikes illegal, although the committees on interstate commerce of both houses reported provisions to outlaw railroad strikes. (Compare the Transportation Act of February 28, 1920, and the Esch Act and the Cummins Act as reported to the House of Representatives and the Senate, respectively, and the conference report, the basis of the Transportation Act as finally enacted.) See, also, Bogni v. Perotti, 224 Mass. 152, 112 N. E. 853, L. R. A. 1916F, 831, and authorities cited; Adair v. United States, 208 U. S. 161, 28 Sup. Ct. 277, 52 L. Ed. 436, 13 Ann. Cas. 764; Pickett v. Walsh, 192 Mass. 572, 78 N. E. 753, 6 L. R. A. (N. S.) 1067, 116 Am. St. Rep. 272, 7 Ann. Cas. 638.

In Wilson v. New, 243 U. S. 332, 37 Sup. Ct. 298, 61 L. Ed. 755, L. R. A. 1917E, 938, Ann. Cas. 1918A, 1024, the Supreme Court held constitutional the Adamson Act of September 3, 1916 (39 Stat. 721 [Comp. St. §§ 8680a–8680d]), enacted on recommendation of the President for the purpose of preventing a general railroad strike then threatened if the eight-hour day was not granted. In the opinion written by the Chief Justice, sustaining a mandatory eight-hour day, there are certainly implications that such a strike would have been a lawful use of force or power on the part of the employés to gain their ends; and that the President in recommending legislative action was recognizing a legitimate force which, if let loose, might, in the language of the Chief Justice, "leave the public helpless, the whole people ruined and all the homes of the land subjected to a danger of the most serious character."

Only in degree is a general strike a greater and more destructive force than a railroad strike. Neither has yet, in plain and apt language, been condemned by the national Legislature. I am forced to the conclusion that, if and when Congress is ready to make the general strike unlawful, language plain, apt and undisguised will be used for that purpose; and that a public policy of that sort will also be made applicable to citizens as well as to aliens.

It should not be overlooked that even during these proceedings Congress has, by the Act of May 10, 1920, added to the deportable classes. And it is significant that, in this new act, Congress did not by name proscribe Communists or alien advocates of the general strike as a political weapon, just as long ago it did proscribe anarchists, whether of the bombing or of the philosophical-pacifist kind. See Turner v. Williams, 194 U. S. 279, 24 Sup. Ct. 719, 48 L. Ed. 979; Lopez v. Howe, 259 Fed. 401, 170 C. C. A. 377.

Historically, governments have been attacked by military forces and by bombing or assassination forces of the Nihilistic and bombing-anarchistic kinds. Against such attacks legislation has been directed. The necessary interpretation of this act seems to me to be that

Congress intended to exclude and expel aliens who advocate force and violence of the life and property destroying kind as a means of changing our political institutions. It was weapons, bombs and the like, that Congress dealt with, not economic forces.

Coming now to the second question in the problem above stated: Was there evidence before the Secretary upon which he might have found the Communist Party committed to the "overthrow" of our government "by force or violence"? The necessary result of the foregoing analysis of the evidence, in the light of the interpretation of the statute adopted, is to require an answer in the negative.

The deportation cases before me all go upon the assumption that the decision of the Secretary in the Preis Case concludes the Acting Secretary of Labor in these cases. The Preis Case is, of course, not before this court. The evidence on which the Secretary based his ruling in the Preis Case is before this court, and I am forced to the conclusion that in it can be found no legal basis for deporting Communists on the ground that they believe in, advocate, or teach the overthrow of the government of the United States by force or violence.

[19] This conclusion that the statute does not outlaw the general strike as a political weapon, and that there is no evidence of the advocacy of any other kind of force, makes it unnecessary to determine whether there was any evidence before the Secretary of Labor that the Communists believed in, advocated, or sought the "overthrow" of our government.

But it is clear that "overthrow" is a very large word, to be carefully distinguished from radical change in the form and functions of our government. Analysis of the Communist Program tends to the conclusion that the Communist Program is one of radical change, and not of destruction or subversion. Under the caption "Political Action" their Manifesto says:

"The proletarian class struggle is essentially a political struggle. It is a political struggle in the sense that its objective is political, overthrow of the political organizations upon which capital exploitation depends, and the introduction of a proletarian state power. The objective is the conquest by the proletariat of the power of the state.

"Communism does not propose to 'capture' the bourgeoise parliamentary state, but to conquer and destroy it. As long as the bourgeoise state prevails, the capitalist class can baffle the will of the proletariat.

"In those countries in which historical development has furnished the opportunity, the working class has utilized the régime of political democracy for its organization against capitalism. In all countries where the conditions for a workers' revolution are not yet ripe, the same process will go on. The use of parliamentarism, however, is only of secondary importance."

Unlike the anarchists, they want a state with more, not with less, power. They would increase, not decrease, the business functions of the state. Their Program seems to me to be one of very radical and, from my point of view, impracticable and fantastic changes in the scope and purpose of our government, not a program for its "overthrow." I doubt whether there is any evidence warranting a finding that the Communists believe in or advocate the "overthrow" of the government of the United States.

Opponents of changes in government generally describe those

changes as "revolutionary"—as involving "a destruction of our ancestral liberties." The Thirteenth, Fourteenth, Sixteenth, and now the Eighteenth Amendments have all been denounced as revolutionary. It is a question of degree and of the point of view. But our government is not yet overthrown. Institutions grounded on liberty and justice under law are too well rooted to warrant us in being terrorized by criticisms and mooted changes. The whole Communist Party is negligible.

At any rate, if correct in my conclusion that the Communists are not engaged in a conspiracy to use force or violence, the petitioners ordered deported are all entitled to be set at liberty.

[20] The construction of the statute here adopted does not leave the country unprotected from any real alien conspirators for the overthrow of our government.

If proscribed, Communists are proscribed because, by advocating the general strike as a political weapon, they are engaged in a conspiracy to overthrow by force or violence the government of the United States. The act of October 16, 1918, so construed, is the practical equivalent of "seditious conspiracy," long ago made a crime by section 6 of the Criminal Code (Comp. St. § 10170), as follows:

"Sec. 6. If two or more persons in any state or territory, or in any place subject to the jurisdiction of the United States, conspire to overthrow, put down, or to destroy by force the government of the United States, or to levy war against them, or to oppose by force the authority thereof, or by force to prevent, hinder, or delay the execution of any law of the United States, or by force to seize, take, or possess any property of the United States contrary to the authority thereof, they shall each be fined not more than five thousand dollars, or imprisoned not more than six years, or both."

If the Communist Party is organized for the purpose of overthrowing the government of the United States by force or violence, it is plainly a criminal conspiracy within the purview of this section. Overt acts in plenty may be found. Hyde v. United States, 225 U. S. 347, 32 Sup. Ct. 793, 56 L. Ed. 1114, Ann. Cas. 1914A, 614. All its members, citizens or aliens, are subject to indictment and criminal trial. If there be really on foot in this country a serious conspiracy of this kind, it should not be dealt with by the immigration authorities, proceeding against aliens alone, the less informed and morally the less guilty. Citizens and aliens thus conspiring should all be haled into the criminal courts and there tried for a statutory offense, akin to treason.

If the Department of Justice is correct in its interpretation and application of the statute of October 16, 1918, to the Communists, it has no occasion to usurp the legal duties of the Department of Labor concerning aliens; it has the power and the duty under section 6, supra, to prosecute.

[21] As this case, as indicated above, is expected to be finally decided by the court above, which may not sustain the views just expressed as to force and violence, it is necessary to refer to one other matter bearing upon the basis of the ruling of the Secretary of Labor against Communists. That matter is the evidence concerning the "under-cover informants" or government spies, and their possible re-

lation to the origin and form of the Communist documents on which the Secretary's ruling is mainly, if not entirely, based.

In Burke's letter to Kelleher of December 27, supra, is this statement:

"If possible, you should arrange with your under-cover informants to have meetings of the Communist Party and the Communist Labor Party held on the night set. I have been informed by some of the bureau officers that such arrangements will be made."

This instruction necessarily implies that the Department of Justice then had, in these two parties, pretended members having sufficient influence so that they could arrange "to have meetings \* \* \* held on the night set." It shows that the government spies were then active and influential in these proscribed parties; they were not mere onlookers.

Kelleher testifies that the Bureau of Investigation had had the Socialists or "Radicals" under examination for a year or more. In the Attorney General's Report for 1919 it appears that a special bureau to deal with "radical activities" was constituted in August, 1919. The Platform and Manifesto of the Communist Party, on which the Secretary of Labor has based his holding that the party is proscribed by the Act of October 16, 1918, were created and adopted at Chicago in September, 1919, only four months before this raid. Although by the Department of Justice, in its so-called briefs and before me, the Communist and the Communist Labor Parties were treated as indistinguishable so far as present issues are concerned, the Secretary of Labor has not so regarded them. He has ruled in the Miller Case (set forth in the margin) [5] that the Communist Labor Party is not a

---

[5] In re Carl Miller

Age 38; native and citizen of Germany; arrived at the port of Galveston, Tex., in October, 1907.

This is a case arising under the provisions of the Act of October 16, 1918. It is alleged that the alien is a member of the Communist Labor Party of America, and that the Communist Labor Party of America is one mere membership in which makes an alien liable to deportation under the Act of October 16, 1918. Alien admits his membership in the Communist Labor Party, that he pays his dues in advance, and that he is familiar with the Manifesto and Program of the party. The question to be determined by the Secretary of Labor is, therefore: Does the Communist Labor Party come within the purview of the Act of October 16, 1918, making aliens who are members of it liable to deportation?

The language of the act applicable to this case is as follows:

"Section 1. \* \* \* aliens who are members of or affiliated with any organization that entertains a belief in, teaches, or advocates the overthrow by force or violence of the government of the United States \* \* \*.

"Sec. 2. \* \* \* shall, upon the warrant of the Secretary of Labor, be taken into custody and deported in the manner provided in the Immigration Act of February fifth, nineteen hundred and seventeen."

In a letter to the Secretary of Labor, dated January 14, 1920, Mr. Swinburne Hale, counsel for the Communist Party and later for the Communist Labor Party, said relative to making arrangements for hearing in the Communist Party Case:

"I have no doubt that if this procedure is satisfactory I can arrange to have similar officials of the Communist Labor Party produced for exami-

force and violence party within the purview of the Act of October 16, 1918. His finding to the contrary as to the Communist Party is based upon the more extreme and so-called revolutionary utterances in its literature.

The most that can be held is that it does *not* appear that the gov-

nation at the same time. You may not, however, feel that this is necessary, since the language of the Communist Labor platform is substantially the same and the number of its members arrested is smaller."

Nevertheless, an examination and comparison of the Communist Party platform and Program with that of the Communist Labor Party platform and Program discloses some very substantial differences. The Communist Party requires its applicants for membership to sign a card reading as follows:

"The undersigned, after having read the constitution and Program of the Communist Party, declares his adherence to the principles and tactics of the party and the Communist International, agrees to submit to the discipline of the party as stated in its constitution and pledges himself to engage actively in its work."

It will be observed that the application for membership requires the applicant to assert that he has read the constitution and Program of the Communist Party, and that he adheres to the principles and tactics of the party and the Communist International.

The Communist Labor Party application for membership is decidedly different. It reads as follows:

"I, the undersigned, recognizing the class struggle between the capitalist class and the working class and the necessity of the working class organizing itself politically and industrially for the purpose of establishing Communist Socialism, hereby apply for membership in the Communist Labor Party. I have no relations as member or supporter with any other political party. I am opposed to all political organizations that support the present capitalist profit system, and I am opposed to any form of trading or fusing with any such organizations. In all my actions while a member of the Communist Labor Party I agree to be guided by the constitution and platform of that party."

There is in this application and pledge no intimation that the member is required to accept the tactics of the Communist International or the tactics of the Communist Labor Party, except in so far as they are expressed in the constitution and platform of that party. Yet it is not the principles advocated, but the tactics proposed to be pursued to secure their adoption, which create the deportable condition.

In order that we may clearly understand the duty devolving upon the Department of Labor, it should be pointed out that the recognition of the class struggle between the capitalist class and the working class, the advocacy of the political and industrial organization of the working class to establish Communist Socialism, the declaration that he has no relations as member or supporter with any other political party, or the declaration that he is opposed to political organizations that support the present capitalist profit system, and to any form of trading or fusing with any such organization, does not make an alien deportable under the law.

The Communist Party asserts that "Communism does not propose to capture the bourgeois parliamentary state, but to conquer and destroy it," thereby making clear its intent to use force to attain the end in view. No matter how much mass action or economic power in the form of strikes may be used as a means of propaganda, it would be impossible to conquer and destroy our present form of government without the use of force, unless it is first captured by the parliamentary methods provided by our Constitution and laws.

The Communist Labor Party makes no such definition. On the contrary, in part I, section 2, of the Party and Labor Program, it declares: "The working class must organize and train itself for the capture of state power."

The Communist Party declares that "participation in parliamentary cam-

ernment *did,* through its agents, give form and color to the documents upon which the Secretary has based his ruling. It is equally clear that no finding can be made that the government did *not,* through its agents, give such form and color, and thus lay a foundation for the inference that the Secretary of Labor has drawn against these aliens because of their alleged membership in the Communist Party.

It should be recorded that in this trial every possible opportunity

paigns * * * is for the purpose of revolutionary propaganda only." The Communist Labor Party makes no declaration to that effect.

Because of these differences, the conclusion was reached that the organizations would be passed upon separately and each dealt with in accordance with its own merits.

The principal excerpts from the Communist Labor Party platform and Program relied upon to show that the organization is one mere membership in which makes an alien liable to deportation under the Act of October 16, 1918, are as follows:

### "Platform.

"1. The Communist Labor Party of the United States of America declares itself in full harmony with the revolutionary working class parties of all countries and stands by the principles stated by the Third International formed at Moscow."

### "Party and Labor Program.

### "Part I.

"The Communist Labor Party of America declares itself in complete accordance with the principles of Communism, as laid down in the Manifesto of the Third National formed at Moscow.

"2. The working class must organize and train itself for the capture of state power. This capture means the establishment of the new working class government machinery, in place of the state machinery of the capitalists."

"6. The most important means of capturing state power for the workers is the action of the masses, proceeding from the place where the workers are gathered together—in the shops and factories. The use of the political machinery of the capitalist state for this purpose is only secondary.

"7. In those countries in which there is a possibility for the workers to use this machinery in the class struggle, they have, in the past, made effective use of it as a means of propaganda and of defense. In all countries where the conditions for a working class revolution are not ripe, the same process must go on."

### "Part II.

"6. Not one of the great teachers of scientific socialism has ever said that it is possible to achieve the Social Revolution by the ballot.

"7. However, we do not ignore the value of voting, or of electing candidates to public office, so long as these are of assistance to the workers in their economic struggle. Political campaigns, and the election of public officials, provide opportunities for showing up capitalist democracy, educating the workers to a realization of their class position, and of demonstrating the necessity for the overthrow of the capitalist system. But it must be clearly emphasized that the chance of winning even advanced reforms of the present capitalist system at the polls is extremely remote; and, even if it were possible, these reforms would not weaken the capitalist system."

### "Part III.

"1. In America the capitalist class has never had a feudal aristocracy to combat, but has always been free to concentrate its power against the working class. This has resulted in the development of the American capitalist class wholly out of proportion to the corresponding development in other

was given the Department of Justice to explain the nature and extent of the activities of its so-called "under-cover informants." Even after the evidence was closed it was stated by the court, in chambers, counsel on both sides being present, that if Burke desired to appear and give evidence on this subject, an application to reopen the case for that purpose would be entertained by the court with a favoring mind, requiring the petitioners to show good cause why it should not be

countries. By their absolute control of the agencies of publicity and education, the capitalists have gained a control over the political machinery which is impossible to break by resorting to this machinery."

"5. It is our duty as Communists to help this process, to hasten it, by supporting all efforts of the workers to create a centralized revolutionary industrial organization. It is our duty as Communists, who understand the class struggle, to point out to the workers that upon the workers alone depends their own emancipation, and that it is impossible to accomplish this through capitalist political machinery, but only by the exercise of their united economic power."

"Program.

"1. We favor international alliance of the Communist Labor Party only with the Communist groups of other countries those which have affiliated with the Communist International.

"2. We are opposed to association with other groups not committed to the revolutionary class struggle."

"7. The party shall make the great industrial battles its major campaigns to show the value of the strike as a political weapon."

In addition to these should be noted the argument by counsel that the tactics of the Communist Party in Russia are the methods intended to be pursued by the Communist Labor Party of America, and that certain statements of prominent Communists relative to the objects of the Communist Labor Party should be taken as showing the intent of the party itself. The tactics of the Communist Party in Russia can have no bearing upon the Communist Labor Party in the United States except in so far as those tactics are accepted or adopted by the Communist Labor Party; nor can the statements made by prominent members of the party be accepted as the expressions of the organization unless the party by its own action adopts the statements.

The excerpts from the Communist Labor Party platform and Program quoted above indicate an extremely radical objective, but there is nothing in them that discloses an intention to use force or violence or that is incompatible with the use of parliamentary machinery to attain the radical end it has in view. The belief in, teaching, and advocacy of the class struggle, mass action, the conquest of political power, the dictatorship of the proletariat, Socialism, Communism, the one big union, shop committees, shop stewards, and other social, industrial, economic, and political changes mentioned in the Communist Labor Party platform and Program, however reprehensible these things may be to the minds of any or all of our people, do not bring the organization within the purview of the act, as long as it does not propose to use force or violence to accomplish the purpose. If the American people are left free to discuss and decide the questions representing themselves for consideration from day to day, uninfluenced by the threat of force or violence, they can be relied upon to protect themselves against any false philosophies, wild-eyed revolutions, or dictatorships of any kind.

The Communist Labor Party of America does not come within the scope of the Act of October 16, 1918.

There being no evidence, other than membership in this party, to show that Carl Miller comes within any of the deportation provisions of the law, the warrant under which he is held is hereby canceled.

[Signed] W. B. Wilson, Secretary.

granted. No such application was made. The court is left to grope its way in a field which should have been fully illumined by the government.

I cannot adopt the contention that government spies are any more trustworthy, or less disposed to make trouble in order to profit therefrom, than are spies in private industry. Except in time of war, when a Nathan Hale may be a spy, spies are always necessarily drawn from the unwholesome and untrustworthy classes. A right-minded man refuses such a job. The evil wrought by the spy system in industry has, for decades, been incalculable. Until it is eliminated, decent human relations cannot exist between employers and employés, or even among employés. It destroys trust and confidence; it kills human kindliness; it propagates hate.

Compare Hunter's "Violence in the Labor Movement," c. 11, and the authorities therefor referred to in the appendix, pp. 368, 373; also "Labor's Challenge to the Social Order," by John Graham Brooks, c. 5.

Compare, also, May's Constitutional History (American Ed.) p. 39 et seq., for historical instances of the baneful results of the government spy system in England.

Now that it appears that government spies constituted in December, 1919, an active and efficient part of the Communist Party, it may well be that the Secretary of Labor will find it desirable, through his own forces, to institute some investigation of the nature and extent of the possible activity and influence of these spies in giving form and color to the documents on which the Secretary based his ruling in the Preis Case.

As the evidence now stands, no important human rights should be determined on the basis of documents whose origin and form are under such well-grounded suspicion.

[22] 3. The third contention is that the records on which the Secretary based his decisions adverse to the aliens are vitiated by lack of due process of law. On this issue the aliens ordered deported must be divided into two groups:

If I am wrong in my conclusion, supra, that conscious, avowed, legally proved or admitted, Communists are not members of an organization advocating the overthrow by force or violence of the government of the United States, and if it also be held that the documents on which the Secretary of Labor based his holdings are, notwithstanding the presence in the Communist Party of government spies, to be held the duly authorized and declared principles of the party, then in the cases of William T. Colyer, Amy Colyer, his wife, Frank Mack, and Lew Bonder the petitions should be denied, the writs discharged, and these aliens remanded into the custody of the respondent; for, in the cases of these four aliens, unlike the rest of the aliens who have been ordered deported, I am constrained on all the evidence to find that the records of their hearings before the immigration inspectors are not vitiated by lack of due process of law.

The Colyers are citizens of Great Britain, and the most competent of the aliens before me to assert and guard their own rights. Both,

in striking contrast to the treatment afforded the uneducated, non-English-speaking Russians, were afforded treatment approximately legal. They were arrested at their home in Wellesley by, or at any rate in the presence of, a labor inspector. While perhaps it does not appear affirmatively that they knew their rights, they did not object to the search of their premises. They told the officers where their books and papers were. I do not think their cases before the inspectors were substantially prejudiced by any unreasonable searches and seizures. They refused to answer questions until they had a lawyer present. The evidence does not warrant a finding that the Colyers were deprived of any substantial rights accruing under the phrase "due process of law" as hitherto applied to the cases of aliens. They are, and frankly avow themselves to be, convinced and enthusiastic Communists. They were English Socialists. They are profoundly and excessively impressed with the defects of present human institutions, and agitating, within what they think are their rights, for radical changes in those institutions.

Frank Mack is also an intelligent Englishman. He knew, and insisted on, most of the rights of a citizen of Great Britain and of the United States. As a result, he obtained the rights which I think material to the validity of the record on which the Secretary of Labor has ordered him deported. This is not a finding that he had proper or legal treatment. Apparently his room was searched, he was taken to Deer Island and held practically incommunicado several days, and was not permitted to see people for about four weeks, although frequently requesting such opportunity. But Mack was admittedly active in the Socialist Party; he was a delegate to the Chicago convention, at which the Communist Party was organized; and on all the evidence I think must be held responsible as an intelligent, conscious, and avowed Communist. He cannot set up errors of procedure to avoid results of acts to which he himself testifies. Motes v. United States, 178 U. S. 458, 20 Sup. Ct. 993, 44 L. Ed. 1150.

But none of these three British citizens is an advocate of force and violence as commonly understood. They are propagandists of the word, not "of the deed."

Although Lew Bonder is a very different sort of person from the Colyers and Mack, I think he must be classed with them, as an intelligent, avowed Communist. He is a Russian who has been some eight years in this country. He speaks a very indistinct and muddled English, almost impossible to understand. But he is a man of considerable intelligence, and pretty thoroughly imbued with economic and social theories. He thinks he understands Communism. He states that he wants to go back to Russia, but does not want to be deported. There is some ground for suspecting that he is not entirely unwilling to return at government expense. But, on all the evidence, I do not think that a finding that his record is vitiated by lack of due process should be made. His case is not free from doubts which the Labor Department might, in its own discretion, well resolve by some further examination of him. But his case must by this court be classed with those of the Colyers and Mack.

[23] But this contention of lack of due process (fair hearing) must be sustained as to the rest of the aliens ordered deported. This includes Matchian, Yarmoluk, Harbatuk, Gessewich, Chaika, Honchereoff, Musky, Sedar Serachuk, and Lanovoy.

It is perhaps true that if the records which went to the Secretary of Labor could be regarded as accurate, adequate, and reliable, there may be in them some evidence warranting the Secretary's conclusion that the aliens are members of the Communist Party. But the difficulties are that these records originated in hearings conducted by the inspectors, in an atmosphere and under conditions which I have already outlined, and which I am constrained to believe prevented the aliens from having a fair, legal, due process of law consideration of their real status.

Bringing the functions of the court strictly within the limits laid down by the authorities cited above, and trying, not the merits of the aliens' cases, but the *trial* of the aliens, I am compelled to hold that the Secretary of Labor has in these cases, of necessity, grounded his decisions upon records misrepresenting or omitting facts of controlling importance.

I find on all the evidence that the records in these cases are not reliable, and that they originated in proceedings which were unfair and therefore lacking in due process of law.

It would not be fruitful now to analyze and state in elaborate detail the numerous complications and contradictions in the evidence concerning these aliens, brought out before me and appearing in the records made before the inspectors which are exhibits before me. But it is plainly not enough, as argued by the Assistant United States Attorney, to find that an alien, particularly a non-English-speaking alien, in one part of his testimony, either before the court or before the inspector, appeared to admit membership in the Communist Party, assuming that such membership is otherwise held to bring the alien within the purview of the Act of October 16, 1918. For illustration: The alien Chaika, testifying before the court, through an interpreter, was asked on cross-examination:

"Q. Are you a member of the Communist Party? A. I am.
"Q. When did you become a member of the Communist Party? A. In the month of September."

This would seem to be conclusive. But after a considerable further cross-examination, Chaika was asked by the Assistant United States Attorney:

"Q. How do you know that you are a member of the Communist Party? A. Because a policeman showed me a membership book in the Communist Party; so I said 'Yes.'
"Q. When did you first learn that you were a member of the Communist Party? A. I didn't know until the first meeting. When the policeman showed me the membership book, he asked me whether that was my name, and I said 'Yes.' Then he said it was my book, and said that book was a membership book in the Communist Party.
"Q. Are you referring now to the hearing at Deer Island? A. The one given at Lincoln, N. H., at the time of my arrest."

This evidence, if true, shows that Chaika never knew until the time of his arrest, when called upon to answer the questionnaire, that the club that he belonged to in the paper mill plant had been admitted, in form at any rate, to affiliation with the Communist party. The flat previous admission therefore goes for naught.

This evidence is typical of the confusion and doubt that arise when an attempt is made to sift the truth out of the records made of the hearings of these bewildered, terrorized, non-English-speaking aliens before the inspectors and out of their evidence before the court.

[24] Assuming for the purposes of the present point that the Secretary's construction and application of the act to the Communist Party may be held to be correct, I accord with what I understand now to be the view of the Department of Labor, that such membership must be a *real* membership in or an *actual* affiliation with the proscribed organization. I do not think that Congress meant to authorize the expulsion of aliens who pass from one organization into another, supposing the change to be a mere change of name, and that by assenting to membership in the new organization they had not really changed their affiliations or political or economic activities. For illustration: When, at meetings of a local of the Socialist Party, notice was given that the local had been expelled or had seceded from the Socialist Party and would thereafter take the name "Communist," and that signatures for membership in the new organization were requisite, nothing more appearing, I could not hold that such new membership, thus created, brings the new members within the purview of the act of Congress. Congress could not have intended to authorize the wholesale deportation of aliens who, accidentally, artificially, or unconsciously, in appearance only, are found to be members of or affiliated with an organization of whose platform and purposes they have no real knowledge.

This principle covers many—perhaps most—of these 9 aliens. Apart from the fact that the records in their cases are grounded in unfair hearings and are very unreliable, it is entirely clear that the membership or affiliation of most of these aliens was but artificial and shadowy.

A summary of the evidence of a few of them will suffice to illustrate the basis of the general finding that these records are grounded on proceedings unfair, lacking in due process of law, and unreliable.

The petitioner Adam Musky testified, through an interpreter, that he was arrested at 7 o'clock on the morning of the 2d of January at his home, 87 Endicott street, Worcester, Mass. Five or six men came into the house and began to look through the room, and took everything they wanted, without asking his permission or showing any search warrant or warrant for his arrest; that he was taken to the police station and kept 24 hours, and afterwards questioned on the train. He was taken to Deer Island. He did not understand English, and when examined at Deer Island he and the interpreter did not understand each other. He spoke Russian, and did not know Lithuanian; that he had no lawyer at the time of the hearing; that after the hear-

ing he was told that he might have a lawyer. The witness said that he joined the Socialist Party, and then went over to the Communist Party when all the others became members of the Communist Party.

"How did you become a member of the Communist Party?" "I don't know. They said they changed the name, and that's all I know."

That he was a member of the Socialist Party about 9 months and read the newspapers; didn't read the Communist literature; didn't have time. All the difference he understood between the Communist and the Socialist Parties was the difference in name; that he never read the Program and the Manifesto of the Communist Party; did not remember whether he ever read the Manifesto of the Socialist Party or not. He never thought that by becoming a member of the Communist Party he was obligating himself to advocate or seek the overthrow of the government of the United States by force or violence; that he did not believe in overthrowing the government of the United States by force or violence. He never had any idea that he was to participate in a bloody revolution in the United States for the purpose of overthrowing the government; that nobody ever told him about such ideas; that he never discussed force, violence, or bloodshed with anybody.

In response to the court's suggestion to find out whether he or any of the other Worcester people had any bombs or guns or dynamite, or other implements or devices of that nature, the witness said he never saw any, never had any, or heard any discussion about getting any such things; that he went to the people's village school in Russia and attended evening school in America three evenings in all; that he reads and writes Russian, but English "very poorly"; that he works in a shoeshop. On cross-examination he said that at the time of his arrest he belonged to the Worcester Local Communists and at one time was secretary of that local, but not at the time of his arrest.

Fred Chaika is one of several Russians taken at Lincoln, N. H., a little paper mill town in the White Mountains. They had a clubroom furnished by the paper company.

Chaika testified, through an interpreter, that he was arrested in his house at 11 o'clock at night by men who came in and began to search his room for Red books; that they arrested him and handcuffed him, in spite of his protest that he had had a broken wrist. No warrant of search or arrest was shown him. He was simply handcuffed, taken to the clubroom, where there were about 14 more arrested people, and kept there until 6 o'clock in the morning; then, handcuffed in pairs, they were taken to the railroad station; thence to Concord, and kept there in jail until Sunday morning; thence to Deer Island. The warrant for his arrest was served on him after he was in jail at Concord. The record of his hearing before the inspector shows that he testified that he became a member of the Socialist Party in April, 1919; that he did not know whether he transferred to the Communist Party or not; he might have read the constitution, but forgot it. He denied being a member of or affiliated with any organization that entertained

a belief in the overthrow by violence of the government. He denied being opposed to organized government. He was, however, willing to be deported, as it appears that he has a wife and child in Russia.

Considering the record of his hearing with his evidence before me, it is clear that this alien had no conception of being affiliated with any organization committed to the overthrow of the government of the United States.

Koly Honchereoff, arrested in Portsmouth, N. H., had been in this country 8 years, and testified, through an interpreter, that he could read and write English a little, but could read and write Russian. He testified before the court that he never read or understood the principles of either the Socialist or the Communist Party. He was a riveter in the shipyard at Portsmouth.

Honchereoff was arrested about 11 o'clock at night in his home with a lot of others and taken to the police station, where the usual questionnaire was presented to him. He testified before the court explicitly that, when asked if he belonged to the Socialist Party, he said, "No." Asked if he belonged to the Communist Party, he said, "No." When asked if he belonged to some union, "Yes; I belong to a union three years." "I said I belong to the union three years; he put it three years in the Communist Party." His questionnaire, made subsequently a part of the record of his hearing, indicates that he admitted that he became a member of the Communist Party on December 11, 1919, but had not a membership card.

Before the court the witness testified that the interpreter did not speak Russian well; that the inspector showed him a list of names, but he denied that he was a member of the Communist Party, or that he told the inspector that he was a member of the Communist Party.

Anton Harbatuk was another of the Lincoln paper mill workers, who was arrested and searched, as were Chaika and Serachuk. A membership book of this Russian branch was introduced containing his name; also a record showing that this Russian club had transferred to the Communist Party December 21, 1919. He testified that he did not read the Program or constitution of the Communists, but paid dues of 60 cents a month; that he joined the Communist Party because they were Russians and had been thrown out of the Socialist Party. Being asked whether he had joined the Communist Party "because the Socialist Party was not radical enough," he replied, "Why, I don't know. I don't know what the meaning of the word 'radical' is." On this being explained to him, he said:

"Why, I got nothing to do against the government, and I have never come to a thought against the government of the United States, only my thoughts of the Russian government."

Before the court he testified that he went to this club.

"I had no other place to go to, and then I thought I ought to belong to some organization." "What did they do at that club?" "They learned how to read and write; also arithmetic. * * * It was a room furnished, belonging to the people who worked in the paper mill." For it they paid "sixty cents a month."

Some of the money was used to buy books to teach the people to read English and Russian.

Sedar Serachuk is another of the Lincoln paper mill employés arrested under conditions such as Chaika described. When the agent of the Department of Justice began to search his room, he said to them:

"If you want to arrest me, show me your warrant. He showed me his fist, and said, 'This is your warrant,' and continued to search the room."

This alien testified, through an interpreter, that at his hearings before the inspector he understood with difficulty; that at this hearing they showed him newspapers and membership cards which were not his; that he had a membership card in the Socialist Party, but did not have one in the Communist Party.

The record of his hearing before Inspector Ryder shows that he testified that he thought the Communist Party and the Socialist Party were all the same; he had not read the paper called "Communist"; and that when extracts and Manifestoes were read to him he answered that "he never heard of it"; that he did not know anything about their being samples of the teachings of the Communist Party. He believed in organized government; he did not know that the teachings of the Communist Party were against the United States government.

"I don't know what it was. A lot of fellows used to go, and so did I. I was approached to buy bonds, and we all bought bonds;" that he knew he "was innocent."

But a card indicating that he had paid three months dues in the Communist Party was apparently held by the inspector as enough to warrant a finding against this alien, and he was ordered deported.

Frank Matchian, of Norwood, Mass., was born in Lithuania, Russia, and came to the United States in 1912. He was arrested on the night of the 2d of January, 1920, at a hall in Norwood, and taken to the police station, where his pockets were searched. The typical questionnaire was submitted to him, which he signed; then he was taken to Deer Island, where he was kept about 3 months. He was first shown a warrant at his hearing at Deer Island, and was never shown a search warrant. They took letters and newspapers from his room. He was a member of the Socialist Party from January, 1914, and never applied for membership in the Communist Party, but said he became a member of the Communist Party by the resolutions passed at the branch or local; that he did not see any difference between Socialists and Communists, except the name; that he did not read the Manifesto and Program of the Communist Party; he read some of the literature, but did not understand some parts; that he had no idea that by becoming a member of the Communist Party he was obligating himself to engage in force and violence for the purpose of overthrowing the government of the United States; that he had no guns, ammunition, bombs, or ideas about such things; that he was always against the use of force and violence; that he expected the communistic state

would come if the majority of the people want Communism and put in the Communist Party. "The Communist Party is a political party;" that it "comes by progress." He never heard any discussion of burning, shooting, killing, bombing, or dynamiting; that in the Socialist local at Norwood were 56 members, mostly speaking Lithuanian, laborers in the different mills in Norwood; had had a Lithuanian hall since 1915; many of the men were married. They met in this hall for society and benefit organizations; that there were six or seven Lithuanian organizations around that hall, one of which was the Socialist Club; that all he knew about Communism was that somebody said the Socialist Party became Communists and he went along with the crowd.

On cross-examination, he testified that he was the manager of the Lithuanian hall; that the literature received there was taken charge of by him and distributed to the members; that he was an organizer for the Socialist Branch in 1918, and still held the position after he became a Communist.

The record of Matchian's hearing before Inspector Ryder indicates that he paid his dues in the Socialist Party up to November, 1919, at 40 cents a month; that this Socialist Club had received a charter for membership in the Communist Party. When his attention was directed to some of the denunciations of capitalism in the Communist literature, he said that he could not "understand all that." Weighing fairly both his evidence before the court and the record made by the inspector of immigration, it is entirely clear that if, and in so far as, he was a Communist at all, it signified to him a mere change of name, an automatic shifting of the old Socialist Club into a Communist Club; that he had no conscious affiliation with any organization supposed by him to be committed to any program of force or violence.

There are no sufficient differences in the cases of the rest of the 9 now grouped as to warrant detailed statements of the evidence in their cases.

But it should be added that the case of Tehon Lanovoy is close to the dividing line. He is a Russian who was arrested at Lincoln, N. H. He has been a student at Boston University, and had started to become a Communist, but had not been actually admitted to the party. I have had some doubt whether he should not· be classed with the Colyers, Mack, and Bonder. But on all the evidence I think that the record put before the Secretary of Labor was vitiated by lack of due process of law and ought not to be held a legal basis for an order of deportation.

[25] The result is that as to these 9 aliens it must be held that the orders of deportation hitherto made are invalid and that these petitioners are entitled to be discharged from the respondent's custody on that ground, even if the broader finding and ruling made as to the Colyers, Mack, and Bonder are not sustained. But, if the broader ruling made as to the Colyers, Mack, and Bonder is not sustained, the decision as to these 9 should be, without prejudice to the right of the Department of Labor, on new proceedings and on records legally and

properly made, hereafter to issue warrants of deportation for any cause, whether now existent or not. In other words: If it be ultimately determined that membership in the Communist Party, admitted or duly proven, on proceedings not unfair or otherwise lacking in due process of law, brings the aliens within the purview of the Act of October 16, 1918, the present decision against the validity of the records of these 9 aliens is not to make this question as to them res adjudicata. Under the conditions named, all that is intended now to be decided as to these 9 aliens is that the hearings had hitherto are unfair and the orders based thereon invalid. But the statutory jurisdiction of the Department of Labor, on proceedings properly instituted and conducted, to determine all questions of fact as to the rights of these 9 aliens, is not by this decision to be held impaired.

This disposition of these 9 cases is, mutatis mutandis, accordant with the decision of the Court of Appeals of this Circuit in United States v. Petkos, 214 Fed. 978, 131 C. C. A. 274. It was there held that, when error was found vitiating the proceedings in the Department of Labor, the District Court ought not to assume the duties of the immigration authorities, "unless no other course can reasonably be taken." Accordingly it was ordered that the discharge of the aliens on habeas corpus be conditioned upon the immigration authorities affording such alien a fair hearing on lawful evidence within a reasonable time. The principle underlying that decision obviously was that the Department of Labor should be left, so far as practicable, to the performance of the duties delegated to it by Congress; the courts limiting their functions strictly to granting liberty in cases where it was illegally restrained. Applying that principle to the changed conditions before this court, I think the Department of Labor should start its proceedings de novo as against these aliens, after a proper investigation, unaffected by the overzealous agents of any other department. The immigration inspectors ought not to be required to hear these cases under any such circumstances or in any such atmosphere as surrounded the previous hearings. . I do not think they would be qualified to do justice under such circumstances. On the other hand, I do not think the records now before this court warrant the court in finding, as facts, that none of these aliens were conscious, avowed Communists.

To repeat, in order to make the point absolutely clear: The finding should be and is limited to a finding that they did not have, before the inspectors, a fair trial of their status.

[26] It remains to consider the cases of the aliens bailed before the end of the proceedings in the Department of Labor.

Section 20 of the Immigration Law (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 4289¼k) authorizes the Secretary of Labor in his discretion to release on bail not less than $500, pending hearing and final decision. In these cases the general order of the Secretary was for bail in the sum of $1,000, unless the local authorities otherwise recommended. Their recommendations were, under the circumstances, naturally, almost necessarily, equivalent to decisions. I assume that

in the ordinary case the court has no power to interfere with the discretion of the immigration authorities as to granting or refusing bail or as to the amount of bail. Some abuse of the power vested in them by the statute must be shown in order to warrant an interference by the court. I think such abuse was here shown.

[27] I regard it as entirely clear on all the evidence, some parts of which have been abstracted above, that the situation of these aliens at Deer Island was, in most essential respects, within the control of the Department of Justice; that the agents of that department were improperly interfering with the recommendations of the labor inspectors who were conducting the hearings; that the recommendations of these inspectors were naturally and properly taken by Acting Commissioner Sullivan as of substantial—generally of controlling—weight, and that Acting Commissioner Sullivan's recommendations were, as already indicated, controlling with the Secretary of Labor in Washington.

There is no evidence warranting a finding that these aliens, if released on reasonable bail pendente lite, would have endangered in any way the public safety, or that they would not have appeared, when required, for further hearing or to answer deportation warrants. There is no reasonable explanation offered for fixing bail in sums which must have been expected to be prohibitive, thus making the provision of the statute and the general order of the Secretary of Labor of no real effect. The aliens, when bailed by this court, had already been held, as though under sentence for crime, for 3 to 4 months. Some of them were arrested and held for days without any warrant whatsoever. Some of them had very substantial savings, one $1,500, others less sums, deposited in banks or invested in government bonds. They are mostly wage-earners of good average type—not loafers or agitators.

[28] Even if the arrests had been lawful and the proceedings had been regular throughout, it cannot be the law that an alien shall be held, beyond a reasonable time, for trial and determination of his right either to go free and earn his living in this country, or to be deported. The fact that in this instance the government had overloaded itself by the wholesale arrest of hundreds of aliens, only a small fraction of whom was there evidence to hold, and had thus caused an untoward delay in the cases of these particular aliens, was not the fault of these aliens. Their rights were, within reasonable time, either to be deported or to be allowed their freedom. Their detention, under all the unprecedented and extraordinary circumstances of this case, I find and rule was illegal, warranting the issuance of the writs.

In analogy to the proceedings in the Petkos Case, 214 Fed. 978, 131 C. C. A. 274, no final disposition of their rights on the present habeas corpus proceedings can now be made. If, within reasonable time, the immigration authorities reach final decisions in these cases, orders must be made accordingly; that is, in the cases in which the government may order the warrants of arrest canceled, the aliens

will be ordered discharged; if, in other cases, the conclusions of the Secretary of Labor are that the aliens shall be deported, obviously such aliens must either be returned to the respondent or must apply to the court, either for a further hearing or for an order for the same kind of relief granted to the 13 aliens above named, against whom deportation warrants have already issued.

The principle upon which I have proceeded in these bail cases is closely analogous to that which guided Judge Knox in Weinstein v. Uhl, 266 Fed. ——, decided on January 14, 1920, in the District Court for the Southern District of New York. I recognize fully that, except under extraordinary circumstances, the court has no right to interfere in behalf of an alien until the proceedings have been completed in the Department of Labor. But I find and rule that the extraordinary circumstances under which these aliens were arrested and detained resulted in an illegal deprivation of their liberty, requiring the court to intervene by the writ of habeas corpus without waiting final disposition of their cases in the Department of Labor.

## Summary of the Results Reached.

(1) There is no evidence that the Communist Party is an organization advocating the overthrow of the government of the United States by force or violence. Hence all the petitioners ordered deported are entitled to be discharged from the custody of the immigration authorities.

(2) If the first conclusion be not sustained by the court above, and if the final holding be that duly proved or admitted Communists are obnoxious to the statute, then in the cases of William T. Colyer, Amy Colyer, Frank Mack, and Lew Bonder the petitions should be dismissed, the writs discharged, and the petitioners remanded to the custody of the respondent for deportation, unless in the opinion of the court above further hearing be requisite to determine whether the "under-cover informants" of the Department of Justice were, in any material degree, influential in giving form and color to the documents of the Communist Party on which the Secretary of Labor based his conclusion against said aliens.

(3) Assuming such final decision to be against duly proved or admitted Communists, then the records in the cases of all the aliens other than the Colyers, Mack, and Bonder, ordered deported, are, on all the evidence, found to be vitiated by lack of due process of law. These aliens are therefore entitled to be discharged from the respondent's custody, but without prejudice to the right of the Department of Labor on new proceedings hereafter to find said aliens Communists and on that ground to deport them.

(4) The cases of aliens admitted to bail pending final decision by the Department of Labor are, after final decision by the Secretary, to be disposed of by discharging aliens in whose cases warrants may be ordered canceled, and remitting the other aliens to their right either to apply for a further hearing to determine whether they are to be

classified with the Colyers, Mack, and Bonder, or with those aliens whose records are vitiated by lack of due process.

Ordered accordingly.

### Addendum.

Pending decision, the Department of Labor has, in three of the bail cases reached conclusions:

In the case of Ivan T. Hyrnchuk, the conclusion is that he should be deported. A consideration of the evidence adduced before me and of Hyrnchuk's record, on which the Secretary of Labor has based his conclusion, shows that that record is, like those of the nine grouped together, supra, vitiated by lack of due process. Hyrnchuk's case is therefore grouped with the other nine, sufficiently dealt with above.

In two other cases, William Chriupko and Samuel Drakewich, the decision of the Department of Labor is that the warrants be canceled. Orders may accordingly be made, setting these aliens at liberty, and of course canceling their bail bonds.